The opinion below is hereby signed.  Dated: November
7, 2005.

_S. Martin Teel Jr_ (signature)
_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re | ) |
| | ) |
| RUFUS STANCIL, JR., | ) Case No. 01-02220 |
| | ) (Chapter 7) |
| Debtor. | ) |

OPINION RE OBJECTION TO 2922 SHERMAN
AVENUE TENANTS' ASSOCIATION'S AND VARIOUS TENANTS' CLAIMS

The debtor, Rufus Stancil, Jr. ("Stancil") and his wife
jointly own an apartment building at 2922 Sherman Avenue, N.W.,
Washington, D.C. ("Sherman Avenue") and Stancil has acted as the
landlord of the tenants of Sherman Avenue.  At issue is Stancil's
objection to the claims filed in this case by nine tenants
identified below ("the Tenants") who rented units at Sherman
Avenue, and the 2922 Sherman Avenue Tenants' Association
("Association").  The Association is a duly incorporated tenants'
association whose members are the nine tenants who are
individually pursuing claims in this case.  The claims at issue
principally arise from Stancil's failure to maintain the Tenants'
dwelling units and common areas at Sherman Avenue in habitable
condition.

After a trial of the objection commencing on June 3, 2004,
and concluding on August 2, 2004, and the consideration of post-

trial submissions, the court issues this opinion as its findings
of fact and conclusions of law.  The court will (1) allow a
substantial portion of each Tenant's claim; (2) allow the
Association's basic claim in some amount that need not be
quantified because whatever amount is awarded will overlap the
allowed Tenants' claims (with only the Tenants allowed to collect
to the extent of an overlap so that there is no double recovery);
(3) disallow the Association's claim for a trebling of its
recovery; and (4) require the Association to submit a statement
of its attorney's fees and expenses to which Stancil may then
object.

I

BACKGROUND

Stancil filed his voluntary petition commencing this
bankruptcy case on October 30, 2001.  For the period of June 1997
through June 2000 ("the claim period"), the nine Tenants and the
Association filed proofs of claim asserting claims for refunds of
rent and other damages based on Stancil's failure to maintain the
apartment building in keeping with the basic standards of
habitability set forth in the D.C. Housing Code and his reduction
of services and facilities provided to the Tenants.

For a significant part of the claim period, Stancil's
failure to maintain the premises in habitable condition flowed
from his financial difficulties.  In November 1997, Stancil
committed most or all of his funds to a post office venture in La
Plata, Maryland.  From that time forward, Stancil suffered a

2

"negative cash flow."  As a result of his financial difficulties,
Stancil was unable to pay his bills, and had to rely on friends
and family for daily expenses as well as money for repairs of
Sherman Avenue.

The Tenants suffered from Stancil's failure, after notice,
to remedy inadequate heat, undependable hot water in the winter,
inadequate control of cockroaches and rodents, water damage,
filthy common areas, and numerous other housing code violations.
This ultimately led to the threatened condemnation of the
building and a criminal conviction of Stancil.

In the spring of 2000, the District of Columbia government
took steps to close Sherman Avenue.  On March 10, 2000, the
Tenants received notice that

> [T]he owners of this building have failed to abate
> numerous substantial violations of the District's
> Housing Regulations . . . .  In addition, there are
> numerous pending violations which place this building
> in the category of substantial disrepair.  Our records
> further indicate that these violations substantially
> impact the health and safety of the residents residing
> in and around this housing accommodation.

As a result, the building was "declared uninhabitable" and
scheduled for closure.  In response to the notice, and to
Stancil's ongoing failure to address the conditions at the
building, the Tenants organized the Association, began paying
their rent into the Association, and took steps to fight the
building closure, which would have left them homeless.  The
District of Columbia government eventually withdrew its plans to
close Sherman Avenue.

3

One approach the Tenants and their Association took to vindicate their rights was to pursue claims against Stancil. Those claims were originally pursued elsewhere.  The claim by the Association, seeking to recover as a representative body on behalf of the Tenants, was pursued by way of a petition filed in June 2000 with the Housing Regulation Administration of the D.C. Department of Consumer and Regulatory Affairs ("DCRA").  The individual Tenants' claims were asserted against Stancil in July and August 2000 as counterclaims to eviction complaints filed by Stancil in June 2000 in the Superior Court of the District of Columbia, Landlord and Tenant Branch.  However, the proceedings in the Superior Court and the DCRA were stayed when Stancil filed his petition commencing this bankruptcy case under chapter 11 of the Bankruptcy Code on October 30, 2001.  The Tenants' and the Association's claims have been pursued here via timely filed proofs of claim.

Stancil's bankruptcy case was converted to a case under chapter 7 of the Bankruptcy Code on January 15, 2002.  Wendell W. Webster was appointed the chapter 7 trustee on January 17, 2002, and on February 15, 2002, the court entered an order permitting Webster to operate the debtor's business.

In addition to the condemnation, the District of Columbia also began a criminal prosecution of Rufus Stancil for failure to comply with the housing code at Sherman Avenue.  On December 12, 2001, Stancil pled guilty to 70 counts of housing code violations, pinpointed at the dates of January 19, 1999, and

4

February 10, 2000 (both dates falling within the claim period).
The Court sentenced Stancil to six days in jail, two years'
probation, and sixty days of living at Sherman Avenue.  In
addition, Stancil's plea agreement required him to dismiss the
pending landlord-tenant cases, complete a plan to renovate the
building, and secure a contractor to perform the renovations.
Stancil also agreed to abate all emergency conditions within one
week and to abate all outstanding housing code violations within
six months.  In addition, the plea provided that Stancil could
not charge or collect rent from the tenants at Sherman Avenue
until the housing code violations had been abated.  Because
Stancil never abated all housing code violations, the Tenants
have never owed Stancil rent for the time period that began after
the end of the claim period at issue here.

    Although Stancil characterizes the Tenants as having
received "four years of free rent," that is a direct result of
Stancil's own criminal conduct and the bargain he struck to
conclude his criminal prosecution.  It has no effect on the
Tenants' and their Association's claims litigated here, except to
permit the court to confine its inquiry to a claim period ending
June 2000 (because no rent was paid after that date, and hence no
refund claims exist for after that date).

    Following the plea agreement in December 2001, the
bankruptcy case, as already noted, was converted in January 2002
to chapter 7, and Sherman Avenue came under control of the
bankruptcy trustee, Wendell Webster, who was authorized to

operate the debtor's business pursuant to an order of February 15, 2002.  The appointment of Webster as trustee relieved Stancil of any authority to undertake repairs to the building.  On October 4, 2002, the Superior Court amended its judgment in the criminal case to order Stancil to "stay away from these premises 2922 Sherman Ave. NW, Wash., D.C. for all purposes and reasons except by order from the Court or with the permission of the Trustee, Mr. Webster."

Webster eventually made a substantial recovery for the estate in litigation relating to Stancil's claims arising from the post office venture in La Plata, Maryland.  When it became clear that the estate would have more than sufficient funds to pay all claims in full, the court ordered an abandonment of Stancil's interest in Sherman Avenue from the estate.  The estate has more than sufficient funds to pay all claims in full, and Stancil, as a party having standing to do so, objected to the Tenants' and the Association's claims.

II

THE OVERLAPPING NATURE OF THE CLAIMS

Each tenant seeks a full refund of all amounts paid during the claim period, with the amounts aggregating $80,524.44.  The Association's claim is, first, for treble the amount of rent

6

overpaid by the Tenants for the claim period[1] (or, if treble
damages are unwarranted, an award of the overpaid rents).  The
Association's claim is, second, for attorney's fees of $38,133.50
and costs of $100.00 incurred by counsel to the Association in
the proceeding before the DCRA.

The nine Tenants' claims and the Association's claims
partially overlap as they both seek to recover the Tenants'
$80,524.44 in rent payments, with the Association seeking an
additional doubling of that amount incident to a trebling of
damages.  The Association concedes that there should not be two
recoveries of the overpaid rents.  It seeks an award of the basic
overpaid rents only as the necessary predicate to its claim for a
trebling of damages, and for attorney's fees and costs: any award
of the basic overpaid rents to the Association would be deemed
satisfied by the award of the same to the individual Tenants.
The Association would then recover its attorney's fees and costs,
and, if treble damages are awarded, the Association would also
recover double damages (representing the part of treble damages
not being collected directly by the Tenants).

III

FACTS REGARDING THE TENANTS' CLAIMS

Each tenant's claim turns on the amount of rent fixed by the

---

[1]  The Association calculates the treble damages claim as
being $240,268.32 representing three times $80,089.44 (the amount
it calculated as being rents the Tenants overpaid to Stancil
during the claim period, and which differs by $435.00 from the
court's $80,524.44 figure).  The court cannot explain the
discrepancy, and will thus treat the Association as seeking a
trebling of the $80,089.44 figure.

7

tenant's lease and paid, and the conditions of that tenant's dwelling unit and common areas.

A.

The following table shows the rents the nine Tenants paid during the claim period, and for which they are claiming a refund.

| Tenant | Apt. No. | Tenancy Length as of June 2000 | Rent and Security Deposit Paid During Claim Period and Asserted as Claim |
|---|---|---|---|
| Armida Alfaro | 201 | 15 yrs. | $13,635.00 |
| Blanca Aviles | 203 (10/1999 – 04/2000) | 7 mos. | 3,210.00 |
| Rubidia Aviles | 204 | 18 yrs. | 12,936.00 |
| Manuel Bonilla | 300 | 14 yrs. | 14,110.00 |
| Marsha Browne | 300 | 33 yrs. | 8,693.44[2] |
| Fidel Maldonado | 200 (June 1999 through December 2000) | 18 mos. | 3,915.00 |
| Maria Martinez | 101[3] & 202[4] | 10 yrs. | 13,600.00 |
| Isabel Moreno | 304 (10/1999 to present) | 8 mos. | 2,175.00 |
| Emiliana Torrez | 207 | 8 yrs. | 8,250.00 |

The aggregate of these amounts is $80,524.44.

To the extent that these claims are not fully allowed as

---

[2]   Browne also seeks to recover $1,050.00 in late fees paid.

[3]   From 1994 to 2003.

[4]   From 2003 to present.

claims for overpaid rent, the Tenants seek amounts they incurred
in expenses for repairs and pest control that were Stancil's
responsibility, and Ms. Browne additionally seeks to recover
$1,050 in late fees as an alternative basis for recovery.

B.

During the time they lived at Sherman Avenue, the Tenants
experienced a number of serious problems with both their
individual units and the common areas of the building.  Each
tenant is entitled to recover based on the conditions present in
that tenant's rental unit and the common areas of the building.
Accordingly, the damages recoverable must be based on each
tenant's circumstances.  However, deficiencies common to all of
the Tenants, of which Stancil was on notice and which he failed
to take adequate steps to fix, included the following.

*Lack of Heat*:  The heat at Sherman Avenue was intermittent
at best.  All Tenants lacked reliable, working radiators and many
of the radiators leaked significant quantities of water.  The
Tenants spent a significant percentage of each winter without
heat.  The common areas were also without heat in the winter.

*Lack of Hot Water*: For the majority of the days in each of
the three winters falling within the claim period, no tenant
enjoyed use of hot water.  On several occasions, Stancil repaired
the hot water problem, but the repairs lasted only a few days
before the problem recurred.  The Tenants had to boil water on
the stove, a time-consuming chore, in order to bathe.  Even
during other times of the year, hot water was unavailable for

9

many tenants except in the evening and the wee hours of the morning.

*Roach Infestation*:  The Tenants experienced ongoing and serious difficulty with extreme levels of cockroaches in their rental units.

*Rodent Infestation*:  The Tenants experienced extreme levels of mice and rats in their homes.  The rat problem started as to some of the Tenants only in early 1999 (although mice were a problem the entire claim period), but some of the Tenants experienced a rat problem starting earlier.

*Common Areas*: The front door to the building had no lock for all or most of the claim period.  There was trash in the common areas.  The basement common area door had no lock.  The basement common area was always filthy.  Strangers entered the building and gambled, urinated, drank alcohol, and used illegal drugs in the basement, leaving broken beer bottles on the floors.  The basement was infested with rodents, soiled with human and rodent excrement, and there was profane graffiti on the wall.  There was trash in and around the building, and trash was not picked up regularly. Any attempts by Mr. Stancil to address these problems did not fix the problems in a lasting way.

### C.

The court now turns to the damages suffered by each tenant. In so doing, the court addresses each tenant's additional problems experienced during the claim period, but will on occasion, by way of illustration, note as well the impact on the

10

tenant of the common problems discussed above.  Unless otherwise
noted, Stancil was on notice of all problems but failed to
correct them or made only inadequate or temporary repairs.  None
of the problems were caused by the Tenants themselves.

The court fixes damages below using the following approach.
As the court concludes later in this opinion, the Tenants are
entitled to a refund to the extent that the rents paid exceeded
the value to which their apartments were reduced by virtue of
Stancil's breaches of the warranty of habitability.  For the
winter months of the entire three years of the claim period, the
Tenants are entitled to a full refund of rent paid as the
conditions were at a level of such degradation that the
apartments were rendered dens of severe human misery.  The value
of the habitable conditions of which they were deprived easily
exceeds the rents that would otherwise be owed for those months.
During the warmer months, the Tenants suffered lesser problems,
but still suffered substantial misery, and only a small value can
be attributed to the apartments.  Finally, the conditions
worsened over time.  For example, at least some of the tenants
had no rat problems (although they had mice problems) in the part
of the claim period preceding 1999.  The court has taken that
into account in fixing damages, with lesser damages awarded for
the earlier versus the latter stages of the claim period.

Some of the Tenants expended funds in addressing the
problems in their apartments.  The court has taken this into
account in fixing the reasonable value of the Tenants' apartments

in the claim period, and the Tenants are not entitled to both the reduction in rent the court grants, which reflects their spending money to fix problems, and to a refund of the money spent as well, as that would result in a double refund. For example, if it costs $300 for a tenant to restore his apartment to habitable (or partially habitable) condition, the tenant is entitled to either reduce his rent payments by $300 or to a refund of $300, but not both.

1.

**Armida Alfaro** has been living at Sherman Avenue for 15 years. Ms. Alfaro's monthly rent was initially $400. After the initiation of her tenancy, Ms. Alfaro was given a lease listing the rent amount as $435, but she continued to pay $400 each month through March 2000 and Stancil acquiesced to payment of that amount in at least partial recognition that the unit was substandard. In April 2000, at Mr. Stancil's demand, Ms. Alfaro paid $435. Ms. Alfaro stopped paying her rent to Mr. Stancil after receiving notice that the building would be closed. Ms. Alfaro paid a total of $13,635 to Mr. Stancil in the claim period. Using $435 as the value of the apartment in habitable condition, Ms. Alfaro suffered a $11,745 reduction in the $15,660 value of her apartment in habitable condition due to Stancil's breaches of the warranty of habitability. In other words, she received only $3,915 in value. She is entitled to a $9,720 refund of the $13,635 in rents she paid.

*Defective Smoke Detector*:  The smoke detector in Ms. Alfaro's apartment was loose, hanging, and did not work.  Ms. Alfaro told Mr. Stancil about the problem, but it was not fixed until about March or April 2000 when the District was threatening to close the building.

*Bathroom Problems (rotted flooring; malfunctioning toilet and faucets; and removal of tub and toilet)*:  Ms. Alfaro had many problems in her bathroom.  Throughout the claim period, her bathtub was off balance and propped up by pieces of wood because of the rotted floor, and she was very afraid that the tub might sink.  There were holes around the foot of the bathtub.  Because of the holes in the bathroom floor, Ms. Alfaro could see through to the basement apartment beneath her.  Ms. Alfaro was afraid the bathtub would sink while she or her children were using it. Although Ms. Alfaro told Mr. Stancil about the problem many times, he did not make any repairs until 2000, at the time of the threatened building closure.  At that time, Mr. Stancil put some wood in the floor to prevent the bathtub from sinking.

For many years beginning before 1997 and until sometime in 2000, Ms. Alfaro's toilet did not function properly and as a result backed up.  Also, the toilet was not properly installed and would move.  Ms. Alfaro showed Mr. Stancil the problem when he came to collect rent.  He said that he would come back the next day, but he never did.  The bathroom faucet leaked water for many years.

13

At the end of March 2000, after a miscarriage at five or six months of pregnancy, Ms. Alfaro returned to her home from the hospital. The next day, a worker came and removed the bathtub and toilet. Ms. Alfaro told the worker that she could not be without the bathtub and toilet as she had just been released from the hospital, but he removed them anyway. Ms. Alfaro and her family were without a tub or toilet for about five days. During this time, she had to use plastic bags to go to the bathroom. After five days, a new bathtub was installed, but the same toilet was returned. New faucets and a replacement cabinet for the sink were provided.

*Heating Problems:* Ms. Alfaro had many problems with her heat, including a lack of heat, throughout the claim period. The radiators in Ms. Alfaro's apartment emitted a large amount of smoke and water; as a result, Ms. Alfaro was unable to use the radiator. The radiator in the bathroom did not function well and barely emitted any heat. It was removed by Mr. Stancil or one of his workers and never replaced.

Ms. Alfaro purchased warm sheets to help keep her family warm, and bought two heaters at $40 to $50 each. Ms. Alfaro told Mr. Stancil about the heat problems when he collected rent; he said "no problem" and "next week," but never did anything.

*Water Leaks and Paint and Plaster Problems:* Throughout the entire claim period, there were frequent water leaks (more often when it was cold) coming from the apartment above into Ms. Alfaro's home, including her bedroom, her children's bedroom, the

14

living room, and the kitchen.

The water leaked into the children's bedroom soaking the bed with water.  The ceiling in the children's bedroom also fell apart.  Although repairs were made to the ceiling, the repairs did not last.  This occurred on many occasions.  There were also water leaks in the living room and Ms. Alfaro had to place a pot under the leaks.  At one time, the living room ceiling leaked so much water that it damaged the television.  The kitchen ceiling also leaked and the ceiling collapsed frequently.

Ms. Alfaro called Mr. Stancil several times about the leaks; he came to the apartment but never repaired the leaks.  Mr. Stancil sometimes came and "half-fixed" the ceiling with plywood; however, in each of those instances the ceiling got wet and fell again within three to four days.

During the claim period, the plaster throughout Ms. Alfaro's apartment was cracked, split, and crumbling; the paint was cracked, peeling, and damaged.  Ms. Alfaro showed Mr. Stancil the problem when he came to her apartment, but he would wave his hand as if to say, who would listen to you, as if he were fed up with listening to her.  No repairs were made until around the time of the building condemnation proceedings.

Throughout the claim period, Ms. Alfaro's walls and ceilings were damp.  Ms. Alfaro's closet was also damp and some of her clothes were ruined because of the dampness.

*Lack of Hot Water:* Ms. Alfaro's apartment lacked hot water during the claim period, mostly when the weather was cold.  Ms.

15

Alfaro told Mr. Stancil about the problem, but he never paid any
attention.  As a result of not having hot water, Ms. Alfaro had
to get up very early and heat water to bathe herself and the
children.  It took about two hours to heat water for bathing
herself and her children.

*Rodent Infestation:*  Ms. Alfaro had a rodent infestation, of
both mice and rats, throughout the claim period.  Some of the
rats were very large and Ms. Alfaro was afraid of being bitten.
Ms. Alfaro saw the rodents in her apartment.  The rodents also
ate clothes and food in the apartment.  Ms. Alfaro had to store
her food in containers with covers to prevent the rodents from
eating it.  The rodents ate through a suitcase in Ms. Alfaro's
closet and destroyed the clothes in it.  On one occasion, a
rodent grabbed Ms. Alfaro's finger while she was sleeping.  Ms.
Alfaro told Mr. Stancil about the problem, but the infestation
persisted.

Ms. Alfaro tried to combat the rodent infestation herself by
buying sticky traps.  The traps cost about $2.00 or $3.00 and Ms.
Alfaro purchased the traps about every two weeks.  Ms. Alfaro
also purchased big traps.  One day, on or about 1999, Ms. Alfaro
caught seven rodents.
The rodents entered Ms. Alfaro's apartment through holes in her
bathroom and around the radiators.  Ms. Alfaro showed Mr. Stancil
the holes and he said he would send someone to fix them the next
day, but he failed to do so until about 2000.

*Roach Infestation:*  Ms. Alfaro had a roach infestation in

16

her apartment throughout the claim period.  Ms. Alfaro stated
that there were more roaches than she could count.  She told Mr.
Stancil about the problem, but the infestation persisted.

Ms. Alfaro purchased poison to combat the roaches.  Each box
of poison cost about $8.00 and Ms. Alfaro purchased about one box
per month.  Ms. Alfaro felt badly about having the infestation in
her home.

*Floors in Poor Condition:*  During the claim period, Ms.
Alfaro's floors were in poor condition.  Her kitchen floor was
destroyed and the tile was peeling off.  Her bathroom floor was
rotted.  Ms. Alfaro's living room and bedroom floors were old and
when she walked across them, she felt like the floor was sinking.
She sometimes got splinters from the floors.  Ms. Alfaro showed
Mr. Stancil the problems, but he did not fix them.  In 2000, he
fixed the bathroom and kitchen floors, but he never made repairs
to the living room or bedroom floors.

*Broken Windows:*  Throughout the claim period, Ms. Alfaro's
windows were broken and malfunctioned.  The window frames in Ms.
Alfaro's bathroom and bedroom were rotten.  The bedroom window
was also cracked.  The living room window had broken windowpanes.
Ms. Alfaro put tape on the broken parts of the glass to prevent
cold air from entering the apartment.  Ms. Alfaro told Mr.
Stancil about the problem and he sent someone to glue the broken
windows.  The bathroom window was never fixed, it was just
painted.

*Malfunctioning Stove*:  Throughout the claim period, Ms.

17

Alfaro's stove malfunctioned.  Ms. Alfaro's stove smelled of gas
and it did not turn on by itself.  In order to turn the stove on,
Ms. Alfaro had to light it with a match.  There were mice nests
inside the oven and the oven stank terribly.  When Ms. Alfaro
opened the oven, mice would run.  The oven racks were also off
balance.  Ms. Alfaro told Mr. Stancil that her stove did not
work.  He did not replace it until 2000.

*Malfunctioning Refrigerator:* During the claim period, Ms.
Alfaro's refrigerator malfunctioned.  The problem was not merely
a need to defrost the refrigerator and Stancil never claimed that
defrosting was all that was needed.  The refrigerator did not
keep food cold and it caused milk to spoil.  When Ms. Alfaro took
food out of the refrigerator, it was warm.  Ms. Alfaro complained
to Mr. Stancil.  Ms. Alfaro purchased a refrigerator during the
claim period, but it broke after a couple of months.  Ms. Alfaro
again complained to Mr. Stancil about her refrigerator, and told
him that she could not keep wasting food.  Mr. Stancil did not
provide a replacement refrigerator until 2000.  The replacement
refrigerator was left outside Ms. Alfaro's apartment, was dirty,
and Ms. Alfaro had to clean it with bleach.

*Malfunctioning Kitchen Light:* During the claim period, Ms.
Alfaro's kitchen light did not work for about one to two years.
Ms. Alfaro told Mr. Stancil, and he provided a replacement light,
which only lasted for about a month before burning out.

*Malfunctioning Electrical Outlets:*  During the claim period,
the electrical outlets in Ms. Alfaro's living room and bedroom

18

malfunctioned.  In the living room, both outlets were loose and one of the outlets did not work.  Also, one of the outlets emitted sparks when items were plugged into it.  In the bedroom, one of the outlets was loose and did not work.  Ms. Alfaro showed Mr. Stancil the problems but they were never fixed.

*Broken Mailbox:* Throughout the claim period, Ms. Alfaro's mailbox was not properly secured.  The mailbox was open on one side and anyone could reach in and take Ms. Alfaro's mail out. Her mail also fell on the ground.  Ms. Alfaro told Mr. Stancil about the problem, but he did not make repairs until 2000, when he replaced some mailboxes.  Even then, Ms. Alfaro's lock did not work and she had to purchase her own lock.

*Broken Front Door Lock:*  Throughout the claim period, the lock to Ms. Alfaro's front door did not work.  The section of the doorframe where the lock belonged was rotten.  Ms. Alfaro told Mr. Stancil about the problem, but he told her to wait.  Ms. Alfaro purchased about two locks during the claim period.  The locks cost about $15.00 each.

2.

**Blanca Aviles** lived at Sherman Avenue during the claim period from October 1999 through April 2000.  Her monthly rent was $435.00.  During the claim period, Ms. Aviles paid a total of $3,210 in rent and security deposit to Mr. Stancil, reflecting $3,045 in rent paid from October 1999 through April 2000 plus a $165 security deposit.  Using $435.00 as the value of the apartment in habitable condition, Blanca Aviles suffered a

19

complete reduction in the value of her apartment due to Stancil's
breaches of the warranty of habitability given the harm this
caused her.  She is entitled to a full refund of the $3,210 in
payments she made.

*Broken Door Lock:*  After Blanca Aviles moved into the
premises, the apartment door lock was not secure.  She reported
this to Mr. Stancil in December 1999.  Although Stancil attempted
repairs, the doorway was never rendered secure.  For example, one
repair fixed the rotted door frame, but not the lock.  In
February or March of 2000, Ms. Aviles was robbed.[5]  She replaced
the lock on her own three times, at a cost of $20.00 each time.

*Falling Ceilings:*  The ceiling in Ms. Aviles' bedroom fell
in during November 1999 due to water leaks that came through the
ceiling when the tenants above turned on their heat.  The falling
ceiling problem also existed in the living room, kitchen, and
bathroom.  Although Stancil belatedly fixed the problem with
respect to the living room ceiling, which ceased leaking, the
problem persisted elsewhere.

*Radiator Leak and Rotted Floors in Bathroom:*  As early as
November 1999, water came out of the bathroom radiator when Ms.
Aviles turned on the valve.  The floor was rotted under the

---

[5]  She was also robbed at a second point after the claim
period, but the court does not assess damages based on that
second robbery.  In one of the two robberies, she lost sound
equipment worth $800.00, a microwave worth $500.00, and jewelry
totaling over $6,000.00 (four rings, three chains, three pairs of
earrings, bracelets, two watches, and three anklets).  The court
need not resolve which robbery it was because a full abatement of
rent is warranted even if the robbery occurred outside the claim
period and those thefts are not taken into account.

bathtub, and the bathtub was not affixed to the floor.  When she walked on the floor, Ms. Aviles felt like the floor was going to fall through to the basement.  Mr. Stancil fixed the radiator valve, but it took him a few days to do so.  Mr. Stancil never fixed the bathroom floor.  The bedroom floor was also rotted from water damage and had holes from rats and rodents.

*Damaged Walls:*  The bedroom, living room, and bathroom walls of Ms. Aviles' apartment were exposed to and damaged by water leaks emanating from the rotted window frames and from the upstairs apartment.  The bedroom window frames rotted due to water damage.  Mr. Stancil did not attempt to repair the walls until March or April of 2000.  Ms. Aviles spent $500.00 on paint and materials and on hiring a painter, Israel, to repair the damage (including plastering).  She spent $2,000.00 replacing water-damaged rugs and carpet.

*Roaches and Rodents:*  Roach and rodent infestations were a problem in Ms. Aviles' apartment throughout the claim period. Mr. Stancil did nothing to address the problem.  Ms. Aviles spent $6.00 per glue trap for the rats, and set them out daily. Roaches were in Ms. Aviles' dishes and drawers "all the time."

*Broken Refrigerator and Oven:*  The refrigerator in Ms. Aviles' apartment did not function properly during the claim period.  Food and milk spoiled in the refrigerator because it was not sufficiently cool.  Mr. Stancil never fixed the problem.  Ms. Aviles' oven did not function properly during the claim period. Mr. Stancil never fixed the problem.

*Lack of Hot Water:*   Throughout the part of the claim period
that Ms. Aviles resided at Sherman Avenue, there was a lack of
hot water during the morning hours when she would have liked to
bathe while getting ready for work.  She had no hot water at all
in the winter months.  When the Tenants complained about the lack
of hot water, which was at least monthly when Mr. Stancil
collected rent, Mr. Stancil would turn the water off completely.

Ms. Aviles moved from the apartment in or around January of
2001, after she became pregnant and did not want to live with the
poor conditions of the apartment, particularly the rotted
bathroom floor, lack of hot water, and peeling paint on the
walls.

3.

**Rubidia Aviles** has been living at Sherman Avenue for 18
years.  From 1997 to 2000, Ms. Aviles' monthly rent was $392.00.
Ms. Aviles paid her rent in full from July 1997 through April
2000, paying a total of $12,936 in rent to Mr. Stancil.  Using
$392 as the value of the apartment in habitable condition, Ms.
Aviles suffered a $10,584 reduction in the $14,112 value of her
apartment in habitable condition due to Stancil's breaches of the
warranty of habitability.  In other words, she received only
$3,528 in value.  She is entitled to a $9,408 refund of the
$12,936 in rents she paid.

*No Smoke Detector:* Rubidia Aviles did not have a smoke
detector during the claim period.  Ms. Aviles told Mr. Stancil

22

about this problem and he replied, "Ok tomorrow I'll have it fixed." Even though Mr. Stancil knew about the problem, a smoke detector was not provided until about April 2000. Because she did not have a smoke detector, Ms. Aviles was afraid that she would be unable to sense it if a fire started.

*Lack of Heat:* Ms. Aviles only had heat intermittently in the winters months during the claim period and the heat functioned very seldom. Ms. Aviles had to turn the stove on to try to heat her home. Ms. Aviles frequently told Mr. Stancil that the heat did not work, but he did not fix the heat.

When the heat was on, the radiators leaked water. When this occurred, Ms. Aviles had to turn off the radiators because otherwise they would soak the entire carpet.

*Lack of Hot Water*: Ms. Aviles did not have hot water for the majority of the days during the winters falling within the claim period. Ms. Aviles told Mr. Stancil about the problem. In order to bathe her children and herself, Ms. Aviles had to boil approximately three pots of water per bath. Ms. Aviles spent about two hours per day boiling water.

*Water Leaks*: Throughout the claim period, Ms. Aviles had water leaks in all of the rooms of her apartment coming from the apartments above, the radiators, and the windows when it rained. Water leaked through the electrical light in her bedroom and onto her bed. The leaks resulted in damage to her apartment, including mold and damage to the paint and plaster, causing holes in the walls and causing the ceilings to fall. The leaks

23

affected Ms. Aviles personally.  She had to use an umbrella when she sat on the toilet.  Although Mr. Stancil performed some work to address the problem, the water continued to leak and water damage such as mold, damage to the paint, and falling plaster, occurred anew.  Mr. Stancil made some "half repairs" in 2000.

Ms. Aviles had loose, peeling, and falling paint and plaster in her apartment.  Ms. Aviles told Mr. Stancil about the problems each time he came to the apartment.  He made some repairs in 2000, but they were not proper repairs.  He made the repairs as a result of an inspector telling him he had to make repairs.  The problem areas were plastered up, but approximately two days later the water would leak again, causing the problems to recur.  The walls and ceilings in Ms. Aviles' home were damp because of the rain and because of the leaking pipes with holes.

*Cockroaches*:  Ms. Aviles had a cockroach infestation in her apartment throughout the claim period.  Ms. Aviles estimated that she saw about 100 roaches per week, with many coming out at night.  Ms. Aviles told Mr. Stancil about the problem and he stated that he would spray, but he never did.  Ms. Aviles bought poison to spray for roaches.  Every month she spent about $7 on the poison.

*Rodents*:  Ms. Aviles had a rodent infestation, including mice and rats, in her home.  The rodents came in through the heating system and also through the sink, the radiators, the bathroom door, and through holes they made in the floor, sink, bathroom walls, and under the tub.  Ms. Aviles had to take

24

special precautions with her food, such as keeping it in a drawer or the refrigerator, to keep it from the rodents.

Ms. Aviles showed Mr. Stancil the rat holes and he said "ok, tomorrow," but did not fix them.  Ms. Aviles purchased cement at Home Depot to patch the holes.  Ms. Aviles also purchased traps. A bag of 2 traps cost about $3.00, and Ms. Aviles placed traps in each of the rooms, including the living room, kitchen, bathroom, and bedroom.  Ms. Aviles caught many rodents in the traps and could not even begin to count the number.

Ms. Aviles felt frustrated living with rodents because they ate her food, chewed her clothes, urinated on everything, and cause her apartment to smell bad.  In 2000, someone sprayed and set traps for the rodents, but never returned.

Ms. Aviles had holes throughout her apartment during the claim period.  In the children's bedroom, there was a large hole in the wall.  In the kitchen, there was a mouse hole in the cabinet under the sink.  There was also a mouse hole in the bathroom wall.  Rodents entered the apartment through the holes. The holes existed from 1997 to 2000.  Ms. Aviles told Mr. Stancil about the holes and he stated that he would have them fixed, but he did not do so until 2000.

The kitchen floor was broken, dirty and rodents entered where the heater had previously been.  The floor worsened during the claim period.  Although Mr. Stancil replaced the floor in 2000, the replacement tiles soon came unglued leaving the wood uncovered.

25

*Flooring Problems*:  The tile on Ms. Aviles' bathroom floor was broken and loose.  The floor was in poor condition in 1997 and had worsened by 1999.

*Backed-up Plumbing*:  Ms. Aviles suffered plumbing problems in 1999--her sink and toilet backed up.  The toilet overflowed with sewage, which also went into the bathtub.  Ms. Aviles was unable to fix the problem herself and she told Mr. Stancil and his son.  Mr. Stancil came to see the problem and left, saying he would send someone to fix it.  The problem lasted for about a month and it smelled very bad.  During this time, Ms. Aviles could not use the toilet, tub, or sink and had to use her neighbor's bathroom facilities.  Ms. Aviles felt desperate as a result of her problems with the bathroom.

*Other Toilet Problems*:  Ms. Aviles had further problems in her bathroom.  Her toilet was loose and improperly secured.  The toilet moved from side to side and water, both clean and dirty, came out when the toilet was flushed.

*Other Plumbing Problems*:  Ms. Aviles' bathtub faucet leaked throughout the claim period.  Ms. Aviles' bathroom sink was also clogged.

Ms. Aviles complained to Mr. Stancil about her bathroom, and although he replied "ok, tomorrow," he never made the repairs.

*Deficient Windows*:  Ms. Aviles' windows were broken and malfunctioned.  In her living room, throughout the claim period, the windowpanes were broken and cracked.  The windows did not have locks or screens.  When Ms. Aviles told Mr. Stancil about

26

the problem, he would lift the curtain, look at the window, and say "ok, tomorrow;" however, the windows were not replaced until about April 2000.

*Kitchen Appliances*:  Ms. Aviles' refrigerator did not work for several months during the latter part of 1997 and until replaced in 1998.  Her oven did not light.

*Electrical Problems*:  Ms. Aviles had electrical problems in her apartment.  There was a loose light bulb hanging from the ceiling.  Also, one of the outlets in the living room did not work.  One outlet in the living room was not affixed to the wall and was hanging throughout the claim period.  The wires in one outlet were exposed and would cause a shock if touched.  These problems were never fixed.  There were no working outlets in the bedroom throughout the claim period and Ms. Aviles had to use an extension cord from the kitchen to the bedroom.

*Broken Mailbox*:  Ms. Aviles' mailbox lock did not work.  She purchased a new one in 1997 for $4.00.  Mr. Stancil replaced the lock in 2000, but charged $1.00 for the replacement.

*Broken Door Lock*:  Ms. Aviles' main door lock was falling out of the door in or about 1999.  She told Mr. Stancil and he said he would fix it, but he did not.  Ms. Aviles purchased a lock for $20.00.

*Missing Laundry Facilities*:  When Ms. Aviles first came to the building, there were laundry facilities.  The laundry facilities were not available during the claim period.

*Basement*:  Ms. Aviles had to go to the basement to access

27

the circuit breaker.  The basement door was not secure.  People went to the basement to smoke and drink.  Ms. Aviles once saw someone shooting up in the basement.  Further, there was human and rodent excrement in the basement.  Ms. Aviles did not allow her children to go to the basement.

4.

**Manuel Bonilla** has lived at Sherman Avenue Apartment #300 from 1990 through the present.  His monthly rent was $415.00 from 1997 to 2000.  During the claim period, Mr. Bonilla paid a total of $14,110.00 in rent to Mr. Stancil, reflecting rent paid from July 1997 through March 2000.  Using $415 as the value of the apartment in habitable condition, Bonilla suffered a $11,205 reduction in the $14,940 value of his apartment in habitable condition due to Stancil's breaches of the warranty of habitability.  In other words, he received only $3,735 in value. He is entitled to a $10,375 refund of the $14,110 in rents he paid.

The following conditions existed in Manuel Bonilla's apartment.  Mr. Bonilla resided in his apartment at Sherman Avenue for the claim period with his wife and children.

*Broken Lock*:  The lock to the entrance door of the apartment did not function properly in 1997.  Mr. Bonilla installed a lock himself in 1998 and paid $26.00 to do so.

*Broken Windows*:  Mr. Bonilla's bedroom windows were broken throughout the claim period.  The upper right window has still not been fixed.  Mr. Bonilla and his wife had to sleep in the

28

same room as their children due to the window problems.

*Recurring Problems with Walls*:  Throughout the claim period, the paint on Mr. Bonilla's and his children's bedroom walls was peeling off and dampened.  Mr. Stancil was informed of the peeling paint problem but never made repairs.  Ultimately, Mr. Bonilla, who works in construction, made the repairs himself.

Every year during the claim period Mr. Bonilla painted the apartment walls, and had to repaint each year because the paint repeatedly peeled.

*Flooring*:  Mr. Bonilla replaced the bathroom floor two separate times during the claim period (and again in 2001) because water damaged the initial and replacement floors.   Mr. Bonilla spent $300.00 in materials each of the three times he replaced the bathroom floor.  He worked for five hours on the floor replacement each time in 1999 and 2000.  His pay rate at those times was $10.00 and $11.00 per hour respectively.

Mr. Bonilla had to replace the kitchen floor himself in 1999 after the floor cracked due to the leaking pipes underneath. Rats entered through the cracks.  Mr. Bonilla spent $200.00 on materials to replace the kitchen floor, and spent thirteen hours of his own time replacing the floor.  His customary pay rate at that time was $8.50 per hour [$110.50].

*Plumbing Problems*:  During the claim period, Mr. Bonilla had to place a bucket underneath the bathtub faucet, which leaked. The toilet in Mr. Bonilla's apartment was not properly affixed to the bathroom floor.  Water leaked onto the floor from the toilet

29

when the toilet was flushed.  Mr. Bonilla fixed the toilet in
November 1997 for approximately $140.00.  Mr. Bonilla also
changed the bathroom sink in 1997 after the water ran all day and
the sink became yellow.

*Holes in the Floor*:  There were holes in the floor
throughout the apartment, including near the radiators.  Mr.
Bonilla spent $250.00 covering up the holes.  Mr. Stancil learned
of, but did not repair, the problem.

*Rodents*:  There was a "veritable storm of rats" in Mr.
Bonilla's apartment.  Mr. Stancil knew about the problem but did
not address it.  Mr. Bonilla's children tripped over the rats
several times and became scared.

*Lack of Hot Water*:  During the time period of 1997 through
the present, there was no hot water in the apartment when the
weather was cold.  Mr. Bonilla and his family had to boil water
in pans in order to bathe.  Mr. Stancil knew about the lack of
hot water from 1997 onward, but did not fix the problem.  Mr.
Stancil would always say that he would fix the problem
"tomorrow."

Mr. Bonilla never received a rent reduction or other payment
from Mr. Stancil for repairs he made in his apartment.
During the claim period, the smoke detector in the apartment did
not function properly.

*Lack of Heat*:  During the claim period, there was not
adequate heat in the apartment.  In 1997 or 1998, Mr. Bonilla
purchased three space heaters - one for each room - at a cost of

$40 each.  In 1999, he bought an additional space heater (again for $40) when one of the previously purchased space heaters ceased to work properly.  Mr. Bonilla's son Kevin got sick in 1998 due to the lack of heat.

5.

**Marsha Browne** has lived at Sherman Avenue for 33 years.  Ms. Browne's rent from 1997 to 2000 was $271.67 per month.  In February 2000, Ms. Browne began paying her rent to the Association.  During the claim period, Ms. Browne paid a total of $8,693.44 to Mr. Stancil, representing 32 months of rent.  Ms. Browne also paid late fees of $35.00 per month for 30 of the months at issue, for a total of $1,050.00 in late fees paid.  Ms. Browne withheld her rent in order to get repairs and then paid her rent in full plus late fees.

Using $271.67 per month as the value of the apartment in habitable condition, Ms. Browne suffered a $7,335 reduction in the claim period's $9,780.12 habitable-condition-value of her apartment due to Stancil's breaches of the warranty of habitability.  In other words, she received only $2,445.12 in value, and is entitled to a refund of $6,248.32 of the $8,693.44 in rents paid.  Moreover, because she was receiving substantially less than full value, she is entitled as well to a full refund of the $1,050 in late fees she paid.  Accordingly, she is entitled to a refund of $7,298.32.

The following conditions existed in Marsha Browne's apartment.

31

*Lack of Hot Water*:  Ms. Browne was without hot water the vast majority of the time during the winters falling within the claim period.  Although Mr. Stancil sometimes repaired the hot water, waiting about a week after learning of the problem before making the repairs, the repairs did not last and the lack of hot water recurred.  As a result of having no hot water, Ms. Browne had to boil water to bathe and to wash dishes.  Ms. Browne felt as if she spent all day boiling water.

*Rodents*:  Ms. Browne had mice in her apartment throughout the claim period.  Ms. Browne saw the mice and evidence of the infestation, including dead mice, mouse droppings, and chewed up food containers in her kitchen and bathroom.  Ms. Browne saw mice every day.

Ms. Browne saw rats in her apartment beginning in 1999. After her initial sighting, Ms. Browne saw rats every day. Ms. Browne called Mr. Stancil about the rodent infestation.  In 1999, Mr. Stancil sent an exterminator once and it did not fix the problem.  Ms. Browne purchased traps and poison and cleaned with ammonia and bleach to fight the rodents.  Ms. Browne purchased traps about two to three times per week.  The traps cost about $1.00 each.  Ms. Browne purchased poison about two times per month and the poison cost a couple of dollars.

*Cockroaches*:  Ms. Browne had a roach infestation in her apartment throughout the claim period.  Ms. Brown saw the roaches every day.  Ms. Browne purchased roach spray and kept the can by her bed at night.  Mr. Stancil sprayed for roaches about one or

32

two times only and it did not fix the problem.

*Holes in the Floor*:  Ms. Brown had a big hole under her bathtub and under her kitchen sink.  Ms. Browne also had holes under the radiators in her kitchen and bedroom.  Rodents entered her apartment through the holes.  Ms. Browne complained to Mr. Stancil about the rodents which entered the apartment through the holes, but he did not fix the problem.  He sent someone to fix the hole under the bathtub, but the hole persisted.

*More Than One Week of Flooding in Bathroom*:  Ms. Browne's toilet, bathtub, and sink were all leaking for more than a week, the time it took Stancil to send someone to fix the problem.  The tenants beneath Ms. Browne, in apartments #101 and #201, complained about the water leaks.  Ms. Browne mopped up the water at least a couple of times per day.

*Leaking Radiators*: Throughout the cold times in the claim period, Ms. Browne's radiators in her bedroom, living room, bathroom, and kitchen leaked water.  Ms. Browne told Mr. Stancil about the leaking radiators and he sent someone to make repairs no sooner than a week after her complaints.  After work was done, the leaks stopped temporarily but recurred.  Ms. Browne kept a bucket under her bedroom radiator to catch the leaking water. The radiators leaked water for about 70% of the winter.  The leaking radiators caused damage to Ms. Browne's apartment, and affected the tenants beneath Ms. Browne.
The paint and plaster in Ms. Browne's apartment were damaged.
The plaster behind the radiator in the kitchen was cracked --

there was a long crack along the wall.  In the kitchen, the paint
was chipping and peeling.  In the living room, the paint was
peeling and cracking by the radiator.  Ms. Brown painted her
apartment in December 1999 because the paint was dirty.  Ms.
Brown asked Mr. Stancil to plaster the apartment because of the
cracks, but he told her he would not do so.  Ms. Browne purchased
about two gallons of paint per room and the paint cost about
$10.99 to $15.99 per gallon.  Ms. Browne also purchased about
four roll brushes, three large paintbrushes, and a couple of
small brushes.  It took Ms. Brown about two months to paint the
apartment.

*Malfunctioning Bathroom Faucet*:  Ms. Browne's bathroom hot
water faucet moved when she turned it on and off.  Also, the hot
water faucet did not turn off all the way and continued to run.
Ms. Browne complained to Mr. Stancil.  Although he sent someone
to fix the problem, it recurred.

*Damaged Bathroom Tiles*:  In Ms. Browne's bathroom, the tile
around the toilet was damaged.  Ms. Brown complained about the
floor to Mr. Stancil, but he did not send anyone to fix it until
after the criminal case, around 2001 or 2002.  The tile around
Ms. Browne's radiator was also damaged.

*Malfunctioning Stove*:  Ms. Browne's stove malfunctioned in
about 1997 or 1998 and Ms. Browne could not turn down the stove
in the summer.  Ms. Browne called the gas company and they turned
the gas off and condemned the stove.  Ms. Browne complained to
Mr. Stancil, but it took him almost a month to provide another

34

stove.

*Malfunctioning Refrigerator*:  Ms. Browne's refrigerator
malfunctioned.  The light bulb inside the refrigerator burned out
and had loose wires hanging.  The freezer compartment was loose
and falling due to loose brackets.  Ms. Browne informed Mr.
Stancil of the problem and he eventually provided another
refrigerator.

*Cracked Kitchen Cabinet Glass*:  Ms. Browne's kitchen cabinet
glass was cracked.  She also had problems with her windows, but
did not specifically tell Stancil about those problems, which
were fixed in April 2000.

*Electrical Problems*:  Ms. Browne had problems with her
electricity.  Her kitchen outlet burned out.  Mr. Stancil
eventually sent someone to fix it, but in doing so the worker
chipped holes in the wall and the holes were never fixed.
Also, the light in Ms. Browne's bedroom would cause an electrical
shortage if she turned it on, and she would have to go to the
basement (which was in awful condition) to flip the circuit
breaker.  Ms. Browne told Mr. Stancil about this problem, but he
did not make any repairs until after the conclusion of his
criminal case.

*Sticking Door*:  Ms. Browne's apartment door was difficult to
open (especially during the summer) and her children could not
open it at all.  Mr. Stancil's attempts to fix the problem were
unsatisfactory, and he did not fix the problem completely until
after the conclusion of his criminal case.

*Laundry Facilities*: The basement had contained laundry facilities when Ms. Browne originally moved into the building, but those facilities were not available during the claim period.

Ms. Browne felt frustrated and depressed living at Sherman Avenue.  She felt like she was going to have a nervous breakdown. In her bathroom, Ms. Browne could see the ceiling of the apartment beneath her and she was afraid the bathroom might collapse.

6.

**Fidel Maldonado** lived at Sherman Avenue during the claim period from June 1999 through February 2000.  His monthly rent was $435.00.  During the claim period, Mr. Maldonado paid a total of $3,915.00 in rent to Mr. Stancil, reflecting rent paid from June 1999 through February 2000.  Using $435 per month as the value of the apartment in habitable condition, Mr. Maldonado suffered a $3,615 reduction in the $3,915 value of his apartment in habitable condition due to Stancil's breaches of the warranty of habitability.  In other words, he received only $300 in value. He is entitled to a $3,615 refund of the $3,915 in rents he paid.

During the claim period, June 1999 through February 2000, Mr. Maldonado resided at Sherman Avenue, apartment 200 with his wife and three small children (eight, seven and six years of age at the time of trial).  He suffered the following conditions during the claim period.

*Door Problems*: Within a few months after Mr. Maldonado moved into the apartment, his front door broke, and the bedroom doors

did not close properly.  Mr. Stancil eventually sent someone to
fix the front door to the apartment, but the repair did not last
because the area where the bolt belonged was not repaired.

*Leaking Water*: From the beginning of his occupancy, water
leaked from above when the occupants in the apartment above
flushed their toilet.  In addition, the radiators in Mr.
Maldonado's and his children's bedrooms leaked water starting in
November 1999.  The ceiling in the children's bedroom fell.
Similarly, plaster fell in the kitchen and the bathroom (with
plaster falling into the bathtub).  Stancil never fixed the
problem: plaster kept falling from the walls almost the entire
time.  Mr. Maldonado spent $200.00 on replacement carpet.  Dirt
and water fell from the hole in the ceiling onto the children's
toys and other personal belongings.  Stancil's only efforts to
fix the water leakage problem was to place drywall on the damaged
areas but not to stop the leaking.

*Rodents*:  Throughout his residency during the claim period,
there were holes throughout Mr. Maldonado's apartment floors – in
the corners of the floors of the two bedrooms, in the kitchen,
and throughout the apartment near the radiators.  The holes got
bigger with the water damage.  Mice and rats entered the
apartment through the holes in the floors.  Mr. Maldonado was
bitten on the toe by a rat and visited a clinic out of fear he
might contract rabies from the bite.  He and his children
witnessed the rats at least every two days, usually at night.

37

*Cockroaches*:  Cockroaches were visible almost every night in Mr. Maldonado's apartment during the claim period, and there were always roaches in the kitchen. He spent $1.00 to $2.00 on each can of roach spray.

*Windows*:  None of the windows in Mr. Maldonado's apartment had screens.  The frames of the windows were broken for several months: attempted repairs did not hold.

*Heat*:  For most of the claim period, Mr. Maldonado's apartment lacked consistent heat.

*Hot Water*:  For most of the claim period, Mr. Maldonado's apartment lacked consistent hot water.  He, his wife, and his children had to boil pans of hot water on the stove in order to bathe.

*Damaged Floor*:  Mr. Stancil did not fix the water-damaged bathroom floor in Mr. Maldonado's apartment.

*Malfunctioning Electric Sockets*: Several electric outlets in Mr. Maldonado's apartment did not function.

7.

**Maria Martinez** lived in apartment number 101 (a basement apartment) at Sherman Avenue from approximately 1994 through the claim period ending in June 2000, and moved to apartment number 202 in 2003.  Her monthly rent was $400.00.  During the claim period, Ms. Martinez paid a total of $13,600.00 in rent to Stancil, reflecting rent paid from June 1997 through April 2000. Ms. Martinez resided in her apartment with her two daughters, fourteen and fifteen years of age at the time of trial, and,

38

during at least part of the claim period, with Eduardo Maldonado.
Ms. Martinez alone signed a lease agreement with Mr. Stancil for
the apartment at Sherman Avenue #101. Eduardo Maldonado's name
was not on the lease agreement, and he was never treated as the
lessee. Ms. Martinez is thus entitled to make any recoveries
based on a breach of the warranty of habitability.[6]

Using $400 per month as the value of the apartment in
habitable condition, Ms. Martinez suffered a $10,800 reduction in
the $14,400 value of her apartment in habitable condition due to
Stancil's breaches of the warranty of habitability. In other
words, she received only $3,600 in value. She is entitled to a
$10,000 refund of the $13,600 in rents she paid.

*Rodents*: Throughout the claim period, Ms. Martinez's
apartment was infested with mice and rats, which she saw on the
premises daily. Ms. Martinez tripped over rats as she went to
bed. In 2000 a rat bit Ms. Martinez on the hand while she was
sleeping, and she awoke to find blood dripping down her hand.
Throughout the claim period, rats ate Ms. Martinez's clothing,
any items made of plastic, and her bathroom soap. The rats

---

[6] Eduardo Maldonado paid $200.00 of the monthly rent on
occasion. Stancil asserts that this should result in an
abatement of Ms. Martinez's claim of $13,600.00. Because the
lease was Ms. Martinez's, she bore the legal responsibility for
making lease payments, was sued by Stancil as having such
responsibility, and had standing to sue for violations of
Stancil's obligations as lessor to her. Her source of making
rent payments is of no relevance. Stancil may not escape his
responsibilities as a landlord by invoking a subtenant
relationship (if such existed between Ms. Martinez and Eduardo
Maldonado) that is not his to invoke.

urinated in her clothing drawer.  Her children tripped over the
rats frequently.  Three large bags of clothing were ruined as a
result of the rats.  Rats entered and ate food from Ms.
Martinez's refrigerator.  On one occasion, in 1999, while she was
sleeping, baby mice and dust fell down on Ms. Martinez's head
through a portion of her bedroom ceiling that caved in from water
damage.

    *Leaking Radiators; Holes; Falling Plaster; Flaking Paint*:
During the winter, the radiators throughout Ms. Martinez's
apartment leaked water in the two sleeping rooms, the kitchen,
and the bathroom.  Throughout the claim period, there were holes
in the wall near the radiators throughout the apartment.  There
were also holes at the corners of the bedroom walls and
underneath the sink throughout the claim period.

    In 1998, the walls or ceiling in the living room of the
apartment caved in.  In 1998 or 1999, the whole wall of Ms.
Martinez's bathroom collapsed, and it was six months to a year
before Stancil finally fixed the problem.  In 1999, Ms.
Martinez's bedroom ceiling fell at the corner where she slept.
Stancil took a month to repair each fallen ceiling, but the
repairs did not last, with the ceiling falling again once the
heat was turned back on.

    The paint on the apartment walls was peeling throughout the
claim period, a problem that got progressively worse from 1997
through 2000.  At one point in the year 2000, Mr. Stancil started
to plaster the walls, but he never completed the work.  From the

time Ms. Martinez moved in through the year 2000, the apartment was never painted.

The bathroom floor was rotted due to water damage throughout the claim period.  The floor by the bathtub was comprised of dirt.

*Refrigerator*: In 1999, Ms. Martinez's refrigerator did not work because rats ate through the wires.  The refrigerator was not fixed; instead, the wires were taped up, and it took Stancil six months to fix the problem.

*Broken Window*:  The kitchen windows were broken during the claim period, and were not fixed until 2000.

*Hot Water*:  Throughout the claim period, there was only hot water in Ms. Martinez's apartment from the evening into the early morning hours.

8.

**Isabel Moreno** has lived at Sherman Avenue, Apartment #304, since sometime in October 1999, but apparently was not charged any rent for October 1999, and has lived there since then.  His monthly rent was $435.00.  During the claim period, Mr. Moreno paid a total of $2,175.00 in rent to Mr. Stancil, reflecting rent paid from November 1999 through March 2000.  Using $435 as the value of the apartment in habitable condition for each of the months of November 1999 through June 2000, he suffered a $3,180 reduction in the $3,480 value of his apartment in habitable condition due to Stancil's breaches of the warranty of habitability.  In other words, he received only $300 in value.

41

He is entitled to a $1,875 refund of the $2,175 in rents he paid.

Mr. Moreno resided in the apartment with his wife and two children, ages sixteen and eight at the time of trial.  He suffered the following conditions.

*Rodents and Cockroaches*:  Mr. Moreno first saw rats in his apartment two nights after moving into the apartment, and saw them regularly thereafter.  He promptly notified Stancil of the problem, and Stancil even saw one of the rats which looked like "the father of all rats."  The problem nevertheless persisted.

There were many cockroach problems in Mr. Moreno's apartment throughout his occupancy during the claim period.  Mr. Moreno first noticed the roach problem the first week he resided in the apartment.  Although Mr. Stancil was notified of the problem, as with the rodent problem, he never fixed it.  Mr. Moreno addressed the problem by purchasing rat and cockroach poison.

*Toilet*:  Mr. Moreno's toilet was not properly affixed to the floor during the claim period.  It swayed from side to side because it was so old that the wax beneath it had worn out.  As a result, he could not sit on the toilet comfortably.  Mr. Moreno notified Mr. Stancil of the problem with the toilet but Mr. Stancil did not respond.  (Eventually, in 2002 or 2003, and albeit not during the claim period but indicative of the seriousness of the problem, Mr. Moreno had to place plywood on the bathroom floor which was rotted from the continuing water damage.)

42

*Bathtub Drain Stoppage*:  During the claim period, Mr. Moreno paid $60.00 to have someone snake the bathtub because the water from the bathtub did not drain properly after Mr. Stancil's flubbed efforts to fix it.

*Leaking Hot Water Pipe*:  The hot water pipe of Mr. Moreno's bathroom sink leaked throughout the claim period.  Mr. Stancil was informed of, but did not fix, the problem.

*Loose Front Door*:  The entrance door to Mr. Moreno's apartment was loose.  Mr. Stancil promised it would be fixed when Mr. Moreno moved in, but it was not.  Mr. Moreno had to fix the problem himself, spending $10.00 on a lock and $4.50 on a slide bolt.

*Peeling Paint*:  Throughout the claim period, the walls throughout Mr. Moreno's apartment had peeling paint due to moisture.  Mr. Stancil was notified of, but did not fix, the problem.

*Holes in the Floor*:  There were holes in Mr. Moreno's kitchen floor, two inches in diameter and beneath the stove. There was also a hole in the floor of the children's bedroom. Rats came in through the holes in the floor, and when that occurred, Mr. Moreno's children were frightened and ran.  Mr. Stancil was aware of rats and never adequately addressed the problem.  Mr. Moreno did not specifically address the holes with Mr. Stancil because he knew that it would be useless to tell him.

*Broken Windows*:  The rotted window frame in the bathroom was never fixed (even though other windows were fixed).

43

*Broken Oven*:   The oven did not properly heat.   Mr. Stancil replaced the oven with a used oven that did not work.

*Broken Refrigerator*:   The refrigerator did not work.   Mr. Stancil failed to rectify the problem after notice, so Mr. Moreno purchased a new one for $250.00.

*Leaking Pipe Under Sink*:   Mr. Moreno needed to place a bucket under the pipe to the kitchen sink for more than 15 days during the claim period due to a leak, which he ultimately fixed himself.   He did not report the problem to Mr. Stancil because Mr. Stancil never did anything to address such problems.

*Lack of Hot Water:*   Mr. Moreno had hot water the first month he moved in, but after that he had hot water only at the "crack of dawn."   After that he had to heat water on the stove to have hot water.

*Lack of Heat*:   Mr. Moreno had to use space heaters during his first winter in the apartment, the winter of 1999/2000, because heat was available only part of that winter, completely stopping at one point.

*Smoke Detector*:   The apartment's smoke detector did not work because it needed a battery.

*Non-Functioning Electrical Outlets*: Mr. Moreno's and his children's bedroom lacked functioning electrical outlets and he had to run extension cords to those rooms.   Mr. Moreno informed Mr. Stancil but Mr. Stancil did not fix the problem.

9.

**Emiliana Torrez** had lived at Sherman Avenue for about eight

44

years when the claim period ended.  During the claim period, when her monthly rent was $250.00, she paid all but three months of rent, and so paid 33 months of rent, or a total of $8,250.00, to Mr. Stancil.  Using $250 per month as the value of the apartment in habitable condition, she suffered a $6,750 reduction in the $9,000 value of her apartment in habitable condition due to Stancil's breaches of the warranty of habitability.  In other words, she received only $2,250 in value.  She is entitled to a $6,000 refund of the $8,250 in rents she paid.

The following conditions existed in Emiliana Torrez's apartment during the claim period.

*No Smoke Detector*:  Ms. Torrez did not have a smoke detector for most of the claim period.  Stancil did not provide a smoke detector until 2000 even though Mr. Stancil knew about the problem.

*Floor Under Toilet*: Ms. Torrez's toilet backed up twice. After the toilet backed up the first time, sometime in 1997, the carpet around the toilet was removed and Ms. Torrez realized there was a hole around the toilet.  She covered the hole with a board, but it still rocked, making it almost unsafe to sit on.

The toilet backed up a second time in 1999 and the backup lasted for about a month.  Ms. Torrez could not use her toilet or bathtub because of the overflowing excrement.  Ms. Torrez had to use a bucket for her "duties," and also borrowed her friends' bathrooms.  Ms. Torrez complained to Mr. Stancil and, after much insistence, he came to see the problem.  However, he did not fix

45

the problem until about a month later.

*Bathtub*:  Ms. Torrez's tub had rust on one side.  In addition, the tub was loose and was not securely in place.  Ms. Torrez had to be very careful using the bathtub.  Although Mr. Stancil came to Ms. Torrez's apartment to collect rent and knew about the problem, he never fixed it.

*Bathroom Sink*:  Ms. Torrez's bathroom sink faucet leaked water throughout the claim period.  Mr. Stancil claimed that the faucet was not properly turned off and he did not fix the problem during the claim period.

*Kitchen Sink*:  Ms. Torrez's kitchen sink faucet leaked continually until Stancil fixed the problem in the spring of 2000.

*Water Leaks; Falling Ceiling; Holes in Floor*: Ms. Torrez suffered problems with her heat during the winters during the claim period, including malfunctioning and leaking radiators.  When the heat was on, the radiators leaked a great deal of water.  She complained to Stancil that the walls in all her rooms were damp.  In her bedroom, the damp walls caused the room to be even colder than the other rooms.  She had to wear extra clothes, and the cold hurt her to the bones.

In the bathroom, there was a constant water leak.  The water leaks from above caused the bathroom ceiling to start falling in.

The water leaks also caused the formation of holes in the kitchen ceiling.  Mr. Stancil's worker sealed a hole, but the hole recurred.  Ms. Torrez's cousin repaired the hole.  The

problem eventually recurred, and Ms. Torrez's ceiling fell and damaged her food, coffee pot, and blender.

In 2000, Mr. Stancil removed a radiator from her home and never replaced it.  When Stancil removed the bathroom radiator, he left a large hole where the radiator had been through which Ms. Torrez could see below her bathroom.

*Rodent and Roach Infestations*: In a way typical of the other Tenants, Ms. Torrez suffered roach and rodent infestations in her home throughout the claim period.  Ms. Torrez saw the rodents, including both rats and mice, and also noticed their excrement in her apartment and that they ate her food.  Ms. Torrez informed Mr. Stancil of the problem, but he did not fix it.  Ms. Torrez purchased traps and poison to combat the pest infestations.  As Ms. Torrez stated, she felt like she was "waging war against rats/mice," and that she was "the one who did battle with the rodents."

*Holes in Walls; Peeling Paint*:  Ms. Torrez had holes in her walls and peeling paint throughout her apartment.

*Defective Condition of Floors*:  The floors in Ms. Torrez's apartment were broken throughout the claim period.  Part of the floor was raised in the kitchen.  Moreover, there were loose tiles in her home.  Because the floor was broken, Ms. Torrez had to exercise caution when walking in her apartment.

*Defective Windows*: Ms. Torrez's windows were defective.  The bedroom window was broken in 1997 during a fire in the building. The windows also malfunctioned in that they did not stay open on

47

their own, were difficult to open, difficult to lock, and had no screens.

*Malfunctioning Refrigerator*:  Ms. Torrez's refrigerator did not work from around 1997 to 1998, as rodents had eaten the seal. Ms. Torrez told Mr. Stancil about the problem many times and even withheld her rent several times.  After about six to seven months and much insistence, Stancil finally fixed or replaced the refrigerator.

*Defective Oven-Stove*:  Ms. Torrez's oven and stove did not work and leaked gas.  As a result, Ms. Torrez had to open the kitchen window and close the bedroom door to reduce the smell of gas.  Even with these precautions, Ms. Torrez experienced headaches.  Ms. Torrez advised both Mr. Stancil and his maintenance worker of the problem; however, the oven and stove were not replaced until after an inspection in 2000.

*Locks*:  Ms. Torrez had to put an extra lock on her apartment door.  Although the door lock worked, the door could still open because it was loose and was neither strong nor safe.  Ms. Torrez's mailbox lock was broken for a long time during the claim period.  Ms. Torrez complained to Mr. Stancil because she was concerned about the lack of security for her mail.

C.

The court now addresses at greater length (1) whether Stancil had notice of the housing code violations, (2) his failure to correct the problems, and (3) the Tenants' not being the cause of the violations.

48

1.

Stancil came to the Tenants' apartments regularly, in person, to collect rent.  On many occasions, when he appeared to collect the rent or when he was in the building, the Tenants pointed out problems in their units that required attention.  His response invariably was "tomorrow, tomorrow," but for the most part "tomorrow" never came.  For example, when Mr. Stancil came to collect the monthly rent from Ms. Alfaro, he would enter her apartment and Ms. Alfaro would show him the problems.  Ms. Alfaro also communicated problems to Mr. Stancil by telling his maintenance man or through the help of her daughter, who speaks English.  On occasion, the Tenants would telephone Stancil to request repairs.  Marsha Browne called Stancil on several occasions to report problems in her apartment.  Other tenants would call with the assistance of someone who could translate from Spanish to English.  Stancil personally inspected each tenant's apartment at least three or four times each year.

Between 1997 and 2000, the District of Columbia Department of Consumer and Regulatory Affairs issued a number of Housing Violation Notices to Stancil, detailing housing code violations in particular apartments or in the common areas.  During the claim period, Stancil, by his own admission, received at least 25 separate notices, citing a total of more than 150 housing code violations.

Stancil also spoke to Rene Marquez, a housing inspector for the D.C. Government, about Sherman Avenue on a regular basis.

Between 1997 and 2000, Stancil saw Marquez "constantly," as many as five times each week.  On many of those occasions, Stancil and Marquez discussed housing code violations at Sherman Avenue.

Apart from denying receipt of certain Housing Violation Notices, Stancil has put forth no evidence to counter the Tenants' claims that they informed him of the problems they were experiencing in their homes.  Accordingly, the Court finds that the Tenants have met their burden of proving that Stancil had adequate notice of the conditions at issue.

2.

Despite being on notice of serious, ongoing problems in the units at Sherman Avenue, Stancil generally failed to provide any long-term, or even medium-term, solutions.  As a general matter, Stancil, when informed of housing code violations, promised the Tenants that he would be back shortly – the next day or the next week – to complete repairs.  In many cases, he never returned at all; in others, he or his employees performed repairs that lasted only a few days.

Vernell Tanner performed extermination services at Sherman Avenue, on what he characterized as a regular basis for "about one year" sometime between 1997 and 1998.  After that, he began coming on an "as-needed" basis, when Stancil called him.

Sometimes Tanner withheld services when Stancil was unable to pay.  Sometimes Tanner was unable to gain necessary access to some of the Tenants' units, and Stancil did not show that he ever made reasonable efforts to have the Tenants make their units

available or to have Tanner return when the Tenants could make
their units available, and did not explain why he, Stancil, was
unable as landlord to give Tanner entry to the units.  Tanner
also told Stancil about holes that needed to be plugged up in the
Tenants' units and plumbing leaks that needed to be fixed as
these were among the things that caused the infestations to
persist.  Stancil, as already noted, failed to take reasonable
step to address the holes and plumbing leaks in the Tenants'
apartments.

It is thus not surprising that the services Tanner performed
during the claim period were insufficient to remedy the rodent
and insect infestations at Sherman Avenue: those conditions
existed throughout the claim period, both when he provided
services on a more regular basis and when he switched to an "as-
needed" basis.

"As-needed" extermination generally does not adequately
address infestation in a multifamily building.  Thus, Stancil's
efforts to remedy the roach and rodent problem were obviously
insufficient attempts to comply with his obligations for those
months (at least 24 months of the 36 months in the claim period)
that he attempted "as-needed" extermination.

Even when Stancil used Tanner on a "regular basis," those
efforts could have started as early as January 1997 and could
have lasted for somewhat less than a year (as Tanner was vague on
precisely how long he came on a "regular basis"), thus resulting
in perhaps only six months in the claim period when Stancil used

51

Tanner on a "regular basis."  In any event, Stancil's efforts
when Tanner came on a "regular basis" were not reasonable:
Stancil did not make adequate arrangements for Tanner to gain
access to all of the Tenants' apartments; Tanner refused to
perform services on occasions when he was not paid; and Stancil
failed to address holes and leaking plumbing that were
contributory sources of the roach and rodent problems.

Aside from Tanner's testimony, the only evidence Stancil has
put forth to suggest that he performed the necessary repairs
appears in his deposition testimony of May 14, 2004.  At
virtually every point in the deposition at which Stancil was
asked about specific conditions, including those listed in
housing violation notices, he responded that he had fixed the
conditions.  The Court does not find Stancil credible on this
point, and rejects his testimony.

3.

The Tenants did not cause the housing code violations at
issue.  Stancil attempted unsuccessfully to show that the Tenants
were responsible for the vermin infestations.  Although the
exterminator, Tanner, believed that the Tenants may have
exacerbated the infestation issues by leaving food out, selling
food from the windows, or throwing trash out the windows, he was
a biased witness, and he could not identify any specific tenant
who engaged in this behavior, and could not identify whether the
tenants allegedly participating in this behavior were the Tenants
who are the claimants in this case or were the non-claimant

tenants also living in the building at this time.  The court
credits the testimony of the Tenants who denied that they engaged
in such behavior, and who were well aware of the need to seal up
food lest the food be eaten by the vermin.  Without Stancil's
employing an exterminator on a regular basis -- the best way to
address such infestations -- and without Stancil's addressing
holes and leaking plumbing, Stancil failed to take reasonable
steps to address the infestation problems and was the cause of
their existence.

IV

THE LEGAL BASIS UPON WHICH THE TENANTS' RECOVERIES ARE PREMISED

In fixing the damages recoverable by the Tenants, the court
has relied on two principal bases for a tenant to recover rent
paid.

A.

Implied Warranty of Habitability

District of Columbia law implies into all residential leases
a warranty of habitability, requiring the landlord to maintain
the premises in compliance with the D.C. Housing Code.  See
Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1081 (D.C.
Cir.), cert. denied, 400 U.S. 925 (1970); see also District of
Columbia Municipal Regulations ("D.C.M.R.") tit. 14, § 301
(Implied Warranty and Other Remedies) ("There shall be deemed to
be included in the terms of any lease or rental agreement
covering a habitation an implied warranty that the owner will
maintain the premises in compliance with [the Housing Code].").

53

Where the landlord breaches that duty, the tenant may withhold all or part of the rent for the unit. "The tenant's obligation to pay rent is dependent upon the landlord's performance of his obligations, including his warranty to maintain the premises in habitable condition." Javins, 428 F.2d at 1082.

In addition to withholding rent, a tenant may invoke the implied warranty of habitability to demand a refund of rent already paid, during periods where the premises were not in compliance with the Housing Code. See George Washington Univ. v. Weintraub, 458 A.2d 43, 46 (D.C. 1983).

To establish a claim for breach of the implied warranty of habitability, a tenant must prove the following elements: 1) conditions existed in the unit or common areas that constituted a violation of the D.C. Housing Code, see Winchester Mgmt. Corp. v. Staten, 361 A.2d 187, 190 (D.C. 1976); 2) the landlord had actual or constructive notice of those conditions, see Weintraub, 458 A.2d at 49; and 3) the landlord failed to repair those conditions in a timely manner. See id.

B.

Void Lease

District of Columbia law also permits tenants to recover for housing code violations on a void lease theory. Like the implied warranty of habitability, the void lease rule provides that where housing code violations render a home unsafe and unsanitary, the lease becomes an illegal contract and is therefore void and unenforceable, leaving the tenant with no contractual obligation

54

to pay rent.  See Brown v. Southall Realty Co., 237 A.2d 834, 837 (D.C. 1968); Javins, 428 F.2d at 1080-81; 14 D.C.M.R. § 302.

The void lease theory applies both to housing code violations that exist at the inception of the tenancy, rendering the lease void ab initio, and to violations arising at a later point, voiding the contract during the course of the tenancy. See 14 D.C.M.R. 302.2 ("After the beginning of the tenancy, if the habitation becomes unsafe or unsanitary due to violations of [the Housing Code]  . . . the lease or rental agreement for the habitation shall be rendered void . . . ."). To establish a void lease claim, the tenant must show that 1) housing code violations exist at the premises; 2) the code violations make the premises unsafe or unsanitary; 3) the landlord knew or reasonably should have known of the conditions; 4) the tenant did not cause the conditions; and 5) the landlord failed to correct the violations in a timely manner.  See 14 D.C.M.R. § 302.

C.

Application of Theories to This Case

The landlord's failure to maintain Sherman Avenue constituted a breach of the implied warranty of habitability, voided his leases with the Tenants, and entitles each Tenant to a refund of rent in this case.  As to the specific elements of the implied warranty and void lease claims, the Court finds as follows.

Between 1997 and 2000, both the Tenants' individual units and the common areas of Sherman Avenue exhibited numerous

55

violations of the D.C. Housing Code.  The most serious and
widespread violations included lack of heat, in violation of 14
D.C.M.R. § 501; lack of hot water, in violation of 14 D.C.M.R. §
606; missing and defective plumbing facilities, in violation of
14 D.C.M.R. § 601; broken or cracked windows, in violation of 14
D.C.M.R. § 705; cracks, leaks, and holes in the walls and
ceilings, in violation of 14 D.C.M.R. § 706; cockroach
infestation, in violation of 14 D.C.M.R. § 805; rodent
infestation, in violation of 14 D.C.M.R. § 806; trash and other
filth in the common areas, in violation of 14 D.C.M.R. § 800; and
a failure to maintain security in the common areas of the
building, in violation of 14 D.C.M.R. § 607.2.

These housing code violations made the Tenants' apartments
both unsanitary and unsafe.  Stancil failed to provide some of
the most basic elements of housing, including heat in the winter
and hot water for bathing.  The roach and rodent infestations and
the accumulation of trash, as detailed in Stancil's criminal
plea, violated basic principles of sanitation.  The lack of
security at the building, which resulted in vagrancy and a
possible gambling operation in the basement, understandably made
the Tenants fearful for their safety.

As noted above, the Tenants did not cause any of the
violations, Stancil had notice of the violations, and Stancil
failed to repair the conditions in a timely and reasonable
manner.  With respect to the latter issue regarding efforts at
repairs, Stancil's occasional temporary patchwork repairs did not

remotely satisfy his duties under the law.  To comply with the
warranty of habitability, the landlord not only must perform
necessary repairs, but must do so in a "workmanlike manner."  14
D.C.M.R. § 701.3.  Stancil's repairs, which were often half-done
or remedied the problem for only a few days, not only failed to
meet this standard, but suggested a lack of good faith in
addressing the problems.  Cf. Bernstein v. Fernandez, 649 A.2d
1064, 1071 (D.C. 1991) (finding sufficient evidence of bad faith
because, e.g., "the same repairs had to be made over and over
again").

In light of the foregoing, the Court finds that Stancil
breached his implied warranty of habitability to each of the nine
Tenants and voided his lease agreements with those Tenants.  See
Javins, 428 F.2d at 1080; Brown, 237 A.2d at 837.

D.

## Assessing Damages Under the Two Approaches

As explained below, the court has awarded damages on the
warranty of habitability theory, and finds it unnecessary to
award damages on the basis of the void lease theory.

1.

The following describes the legal standards the court
employed in fixing damages under the implied warranty of
habitability theory.  Under that theory, once the tenant has
proven a breach of the warranty, the tenant is entitled to an
abatement of rent calculated according to the degree of the
breach.

Stancil urged the court to fix damages by taking into consideration what the Tenants would have been required to pay had they rented units in other apartment buildings that were in compliance with the housing code.  Stancil showed that comparable housing in good condition commands a much higher rent than was charged these Tenants under their leases.  Accordingly, he argued, what these Tenants paid was a fair "as is" value of the premises.  However, a landlord guilty of substantial housing code violations ought not be allowed to minimize the damages owed by resort to a market rate of rent for the premises, reduced for the housing code violations, because that approach could result in no damages at all despite a tenant being entitled to the benefit of her bargain that the premises would be in compliance with the housing code.

Javins directs a court to find, first, whether housing code violations existed, and, second, to determine "what portion, if any or all, of the tenant's obligation to pay rent was suspended by the landlord's breach." Javins, 428 F.2d at 1082-1083. In a footnote, Javins explained that "one or two minor violations standing alone which do not affect habitability are de minimis and would not entitle the tenant to a reduction in rent." Id. at 1082 n.63.  This suggests that the agreed rent in the lease is to be decreased according to the degree of the housing code violations, and that the agreed rent--not a market rent for similar units in compliance with the housing code--is the appropriate starting point in fixing damages.

However, at least in commercial cases, examination of market
rents in fixing damages has been upheld.  In Rubinstein v.
Lichtenstein, 137 A.2d 219 (D.C. Mun. App. 1957), a commercial
lease case, the tenant, a drug store operator, established that
the promised level of air conditioning had not been provided
(resulting in drugs and merchandise melting), and presented as
evidence of damages the expert testimony of a realtor as to the
market value of the premises with and without air conditioning.
The court upheld a jury instruction that "the measure of damages
was the difference between the rental value of the premises in
the condition as contracted for and the rental value of the
premises in their actual condition," and noted that the realtor's
expert testimony "as to the market value of the premises with and
without air conditioning furnished the jury guidance in its task
of ascertaining damages."  Id. at 220.  See also Columbus
Properties, Inc., 644 A.2d 444, 447-48 (D.C. 1994).

In Cooks v. Fowler, 455 F.2d 1281, 1282 n.5 (D.C. Cir.
1971), a case involving a residential rather than a commercial
lease, the court quoted the Rubenstein damages formulation, 137
A.2d at 220, in support of its proposed methodology for fixing
the amount of protective order payments that would be required of
tenants seeking a stay pending an appeal of an adverse judgment
in an eviction proceeding.  Notwithstanding the reference to the
Rubenstein formulation, which looks at the difference between the
rental value as promised versus the rental value "as is," the
Court of Appeals in Cooks ultimately fixed the amount of

59

protective order payments by first accepting the contracted for rent as evidence of "the occupancy value of the apartment if it fully complied with the housing regulations." <u>Cooks</u>, 455 F.2d at 1283.  The reference to the <u>Rubinstein</u> formulation was thus unnecessary: the Court of Appeals' utilization of the agreed rent as the starting point is equally consistent with a rationale that a tenant is entitled to receive habitable premises at the contract price and that, based on the degree to which the premises are inhabitable, a reduction in the lease's stated rent is what is to be paid incident to a protective order.

In calculating a residential tenant's damages based on housing code violations, it makes no sense to restrict the tenant to a comparison of market rental values of the property in sound condition versus the value of the property in its as-is condition.  "The duties imposed by the Housing Regulations may not be waived or shifted by agreement . . . ." <u>Javins</u>, 428 F.2d at 1081-82.  Accordingly, a tenant cannot be deemed to have bargained away the habitability requirements in exchange for a lower rent.  It follows that the parties' contract reflects the deemed-bargained value of the premises in good condition. Damages ought to be measured according to the degree that violations of the housing regulations deprive the tenant of that agreed value and hence the benefit of the bargain.[7]

---

[7]  A formulation tied to market rental values could theoretically result in the tenant recovering not only rents paid but amounts in excess of rents paid.  Thus, if the rent under the lease is $500 per month, the market rate for premises in

The District of Columbia Court of Appeals has viewed <u>Cooks</u> as being of "very limited precedential value." <u>Bernstein,</u> 649 A.2d at 1072.  There the Court of Appeals upheld a full abatement of rent, stating:

> [The landlord's] contention that the value of the apartment in good repair and its value "as is" were not shown is simply wrong.  The value of the apartment in good repair was established by proof of the amount of the monthly rent, as <u>Cooks</u> itself teaches. [Citing <u>Cooks</u>, 455 F.2d at 1282.] Furthermore, the persistent and extreme problems with leaking and falling ceilings and rodent infestation were sufficient to allow the jury to find that the apartment's "as is" value was zero, thereby allowing a complete abatement of rent. Expert testimony or other evidence of the market value of an apartment in such condition was not necessary; evidence of the problems themselves was enough. [Citing <u>Javins</u>, 428 F.2d at 1082-83.]

Although the Court of Appeals in <u>Bernstein</u> did not specifically hold that evidence of market rates was irrelevant, it clearly upholds the approach suggested by <u>Javins</u> of measuring damages by starting with the agreed rent and reducing it according to the degree of the housing code violations to arrive at the appropriate amount of rent that was actually owed.

<u>Hsu v. Thomas</u>, 387 A.2d 588 (D.C. 1978), a case decided prior to <u>Bernstein</u> and involving a residential tenant, worded its damages formulation somewhat differently, finding it appropriate

---

compliance with the housing code is $1,500 per month, and the market rate for the premises in an as-is condition is $200, the landlord would owe $1,300 per month in damages even though the tenant paid only $500 per month in rent.  <u>See</u> Mark Andrew Stafford, <u>A. Miller v. C. W. Myers Trading Post: North Carolina Adopts Expansive Tenant Remedies for Violations of the Implied Warranty of Habitability</u>, 66 N.C. L. Rev. 1276, 1285 n.68 (1988).

to award damages based upon the rent paid in excess of the
reasonable value of the leased property.  Hsu, 387 A.2d at 589.
In that case, however, the court proceeded on the void lease
theory (discussed below).  Moreover, the case was an appeal
brought by the landlord in which the tenant did not contest the
court's methodology for calculating damages.  The District of
Columbia Court of Appeals has not viewed Hsu as precluding
tenants from quantifying damages as a percentage of the agreed
rent.  In Cowan v. Youssef, 687 A.2d 594, 600 (D.C. 1996), the
Court of Appeals adopted the Bernstein approach in upholding a
damage award for breach of a contractual provision which did not
rise to the level of a breach of the warranty of habitability.
The Court of Appeals observed that "the value of an apartment in
good repair may be established by proof of the amount of the
monthly rent" [citing Bernstein, 649 A.2d at 1072] and that
"evidence that an apartment is not in good repair -- e.g., that
its heating and cooling system does not work properly -- is
sufficient to allow a jury to find a decrease in the value of
that apartment, which would provide a basis for assessing
damages." Cowan, 687 A.2d at 600, citing Hsu, 387 A.2d at 589;
Javins, 428 F.2d at 1080.  The court also upheld an instruction
that the jury should quantify the damages award as a percentage
of the rent paid by each tenant.  Cowan, 687 A.2d at 604.  This
approach for fixing damages is equally appropriate for a breach
of the warranty of habitability as it is for a breach of some
other contracted-for service.

Stancil's approach would have this court measure damages by comparing the market rate of the units in "as is" condition as against the agreed rents, and award little in damages because on the market the Tenants would not get substantially better housing at their agreed rents.  Even under Rubinstein that is an inappropriate methodology because it does not utilize as the starting point the market rate of the units if they were in compliance with the housing code (which he concedes are much higher than the agreed rents).[8]

In accordance with Cowan, Bernstein, and Javins, the court concludes that in fixing damages, the starting value is the agreed rent -- representing  what the tenant bargained for (a unit in compliance with the housing code at the stated rent) -- and the percentage diminishment of that value then constitutes the amount of damages.

The reduction of required rent is based on the seriousness of the code violations.  See Javins, 428 F.2d at 1083.  The law contemplates a sliding scale of rent abatement, depending on the conditions: the factfinder may find that "no part of the tenant's rental obligation is found to have been suspended" because the problems were de minimis; that "part of the tenant's rental obligation has been suspended but that part of the . . . rent is indeed owed to the landlord," or, finally, that "the entire rental obligation has been extinguished by the landlord's total

---

[8]  As already noted, the Rubinstein approach could result in Stancil owing the Tenants more in damages than the rents paid.

63

breach." <u>Javins</u>, 428 F.2d at 1083.

<u>Javins</u> did not define what constitutes a landlord's total breach, but <u>Bernstein</u> held that where the problems are especially severe, the factfinder may find that the "as-is" value is zero. <u>Bernstein</u>, 649 A.2d at 1072.  In <u>Bernstein</u>, the court upheld a jury award of a full rent abatement based on evidence of leaking ceilings, rodents, and roaches, as well as disruptive repairs that required the tenant to live in "the mess and the debris" for extended periods of time.  <u>Id.</u> at 1068.  The appellate court rejected the proposition that "bare shelter" is worth one-third of the contract rent, holding instead that the "persistent and extreme" housing code violations supported a finding that the unit had an "as is" value of zero.  <u>Id.</u> at 1072.  The court, however, did not require treating the value as zero in all such cases of persistent and extreme violations; it only held that this was a permissible finding by the jury.

Evidence that the Tenants viewed the rents as acceptable is irrelevant as they cannot waive the warranty of habitability.[9]

2.

A void lease claim presents a different method for calculating damages than a claim based upon a breach of the implied warranty of habitability.  A void lease relieves the tenant of the obligation to pay the rent listed in the contract.  See William J. Davis, Inc. v. Slade, 271 A.2d 412, 416 (D.C. 1972).  Although the landlord still may recover rent where the lease is void under a quasi-contractual theory, once the tenant has proven her claim the burden shifts to the landlord to establish "the reasonable value of the premises in its condition as it was when occupied."  Id.  The Tenants argue that both the implied warranty and void lease claims require the court to determine to what extent the housing code violations diminished the value of the unit, and award damages accordingly.  However, if the void lease approach permits Stancil to resort to market

_____

[9]  The Tenants' testimony on cross-examination as to the "value" of their apartments does not assist the Court here. Although Marsha Browne, for example, testified that her rent adequately reflected the worth of the building, see Testimony of Marsha Browne, July 26, 2004, Ms. Browne can no more waive her right to a habitable apartment by testimony than by signing a lease agreement.  The rent established in the lease reflects not the tenant's judgment of the as-is value, but "the value of [an] apartment in good repair."  Bernstein, 649 A.2d at 1072.  Where, as here, the apartment is in deplorable condition -- to which Ms. Browne also testified at trial -- the Court must reduce the rental value to reflect the conditions.  See Javins, 428 F.2d at 1083.  Similarly, Ms. Alfaro's testimony regarding the rent she paid -- that the rent for her apartment was only $400 versus the $435 monthly rent cited in the lease -- does not reflect the value of her apartment.

rates in establishing the value of the premises in "as is" condition, an issue this court need not decide, the record would warrant damages in an amount no greater than, and possibly in an amount smaller than, the amount of damages available under the implied warranty approach.  The record might support a finding that units in compliance with the housing code support a higher market rent than the rent Stancil was charging, and basing damages on a diminishment of that value could result in a finding that the Tenants owed more than the amount calculated under the implied warranty approach (which need not take market values into account).  Because the amount of damages fixed by the court based on the implied warranty theory equals or exceeds the amount that would be recoverable based on the void lease approach, the court need not decide the amount of damages recoverable under a void lease theory.

E.

Late Fees

The Court further finds that Marsha Browne is entitled to a refund of any late fees she paid during the claim period.  Ms. Browne paid these fees, which are included in her proof of claim, on several occasions after withholding rent in an effort to force repairs.  Where a tenant withholds rent due to housing code violations, and subsequently proves the existence of those violations, imposing late fees is inequitable and impermissible.  Accordingly, Ms. Browne is entitled to recoup those fees, along with her rent, in this action.

66

F.

<u>Tenant Expenditures Addressing Problems</u>

The Tenants argue that, to the extent a full refund of rent is not ordered based on the severity of housing code violations, they are entitled to claim the value of their  expenditures for repairs as a credit against their rents, thereby reducing the amount to which Stancil was entitled from them, and increasing the refund to which they are entitled.[10]  However, in measuring the lost value based on housing code violations, the court took into account expenditures the tenants were forced to make.  If the court additionally ordered a recovery of these expenditures, that would, as already explained, result in double counting.

V

THE ASSOCIATION'S CLAIMS

The Association had standing to proceed before the DCRA on its claims.  The Association was authorized by 14 D.C.M.R. §§

---

[10]  Rule 5(b) of the D.C. Superior Court Rules (Landlord and Tenant Branch) permits a tenant in an action for nonpayment of rent to assert "a counterclaim for a money judgment based on the payment of rent or on expenditures claimed as credits against rent. . . ."  SCR-LT 5(b) (2004).

4214.3(e) and 4214.4(e) to pursue a claim before the DCRA.[11]

## A.

Only the Association has pursued a claim under D.C. Code § 42-3509.01 (2001), including a claim for treble damages. The court will sustain the objection to the claim for treble damages, but will grant the Association a rollback of rent in an amount that need not be quantified because whatever the amount, it will overlap the amounts to be recovered by the Tenants for breach of the warranty of habitability. The court will further permit the Association to recover attorney's fees under D.C. Code § 42-3509.02 upon submitting a statement of attorney's fees.

§ 42-3509.01(a) provides:

Any person who knowingly (1) demands or receives any rent for a rental unit in excess of the maximum

---

[11]   14 D.C.M.R. § 4214.3(e) provides:

The tenant of a rental unit or an association of tenants of a housing accommodation may, by petition filed with the Rent Administrator, challenge or contest any rent or rent increase for the rental unit which is implemented when the rental unit or common elements of the housing accommodations are not in substantial compliance with the housing regulations, and the absence of such substantial compliance is not caused by the neglect or misconduct of the tenant.

14 D.C.M.R. § 4214.4(e) provides:

The tenant of a rental unit or an association of tenants of a housing accommodation may, by petition filed with the Rent Administrator, complain of and request appropriate relief for any other violation of the Act, including but not limited to: Any condition of the rental unit or housing accommodation which constitutes a substantial or prolonged violation of the housing regulations.

allowable rent applicable to that rental unit under the
provisions of subchapter II of this chapter [§§ 42-
3502.01 to 42-3502.21, addressing rent ceilings and
other restrictions on allowable rent], or (2)
substantially reduces or eliminates related services
previously provided for a rental unit, shall be held
liable by the Rent Administrator or Rental Housing
Commission, as applicable, for the amount by which the
rent exceeds the applicable rent ceiling or for treble
that amount (in the event of bad faith) and/or for a
roll back of the rent to the amount the Rent
Administrator or Rental Housing Commission determines.

That provision is inaccurately incorporated in the D.C.M.R. in
addressing the relief available pursuant to a tenants'
association's petition pursued before the DCRA.  Specifically, 14
D.C.M.R. § 4217 provides:

**4217.1**  Where it has been determined that a housing
provider knowingly demanded or received rent above the
rent ceiling for a particular rental unit, or has
substantially reduced or eliminated services previously
provided, the Rent Administrator or the Commission
shall invoke any or all of the following types of
relief:
    (a) A rent refund; and
    (b) Treble the amount of the rent refund ordered
    to be paid; or
    (c) A rent rollback for a specific period or until
    specific conditions are complied with.
**4217.2**  Rent refunds under § 4217.1 shall be trebled
only where detailed findings of fact are made that the
housing provider acted in bad faith.

B.

The statute and regulation raise several issues of
interpretation.

1.  <u>Is the treble damage remedy ever available when only a
reduction in services has been demonstrated?</u>  A predecessor
version of the statute was interpreted in <u>Interstate Gen. Corp.
v. D.C. Rental Hous. Comm'n</u>, 501 A.2d 1261 (D.C. 1985), to permit

69

a treble award of the amount of rent charged or paid in excess of
the rent ceiling resulting from a substantial reduction in
services.  There the Court of Appeals upheld an order of the
Rental Housing Commission directing the refund based on a
substantial reduction in service -- a 45-day loss of air
conditioning in tenants' apartments during the summer months.
The tenants' petition for a refund based on a substantial
decrease in services required the administrator to "consider
adjustments allowed by [D.C. Code § 45-1692 [(1980 Supp.)]."
Section 45-1692 was essentially identical to D.C. Code § 42-
3502.11 (2001) which provides:

> If the Rent Administrator determines that the
> related services or related facilities supplied by a
> housing provider for a housing accommodation or for any
> rental unit in the housing accommodation are
> substantially increased or decreased, the Rent
> Administrator may increase or decrease the rent
> ceiling, as applicable, to reflect proportionally the
> value of the change in services or facilities.

Accordingly, the substantial reduction in services in <u>Interstate</u>
was viewed as requiring a decrease of the rent ceiling.
<u>Interstate</u>, 501 A.2d at 1265.  In other words, a substantial
reduction in services may result in a reduction of the rent
ceiling made retroactive to the date of the reduction in
services.  <u>Afshar v. D.C. Rental Hous. Comm'n</u>, 504 A.2d 1105,
1108 (D.C. 1986).  Accordingly, a refund is warranted when the
rents demanded or collected exceeded the rent ceiling as
adjusted, upon request, for the substantial reduction in
services.

70

2.   <u>May treble damages be recovered when the rent charged does not exceed the rent ceiling as adjusted for a substantial reduction in services?</u>  A reduction in the rent ceiling based on a substantial reduction in services does not necessarily mean that rents charged or collected exceed the rent ceiling.  Unless the rents charged or collected exceed the rent ceiling, as adjusted for the substantial reduction in services, no treble damages are available.  <u>Afshar</u>, 504 A.2d at 1108, 1109 n.8 (interpreting a predecessor statute which, as relevant to this issue, was identical to § 42-3509.01(a)).  Although 14 D.C.M.R. § 4217 authorizes a trebling of a rental refund without a showing that the rent charged exceeded the rent ceiling, that aspect of the regulation must be rejected as inconsistent with the statute. A regulation is a nullity if contrary to the statute under which it is promulgated.  <u>See</u> <u>Tenants of 738 Longfellow St. v. D.C. Rental Hous. Comm'n</u>, 575 A.2d 1205, 1213 (D.C. 1990).[12]

3.   <u>What is the character of the remedy available under § 42-3509.01(a) when the rents charged do not exceed the rent ceiling?</u>  The remedy of a rollback would be available in the case of a substantial reduction in services even if the rents charged did not exceed the rent ceiling.  <u>Afshar</u>, 504 A.2d at 1108.  A

_____

[12]  In <u>Miller v. D.C. Rental Hous. Comm'n</u>, 870 A.2d 556, 558 (D.C. 2005), the court observed that "§ 42-3509.01(a) subjects a person who 'knowingly' commits certain violations having to do with rent charges or provision of services to the penalty of return of excess rent (which may be trebled) or a roll back of rent charged."  However, that observation was dicta and did not specifically address whether "excess rent" means rent in excess of the rent ceiling.

rollback alters the terms of the existing lease by bringing the
rent "into line with the services the landlord actually
provides." Id.  For the statute to remedy past violations, the
rollback, of course, must be retroactive to the date of the
violations.

As discussed below, because no evidence was submitted to
establish the rent ceilings applicable in the claim period, the
Association may not recover treble damages.  That makes the issue
of "bad faith" (relevant only to whether treble damages are
appropriate) moot,[13] and leaves a rollback as the only possible
remedy under § 42-3509.01(a).

4.  If a service was not in place when a tenant's lease
commenced, does that mean that the failure to provide the service
was not a reduction in "previously provided" services?  Stancil
argues that some of the Tenants entered into leases when certain
services were already lacking, and that a continued failure to

---

[13]  The statute requires bad faith in order for treble
damages to be awarded.  Compare Jerome Mgmt., Inc. v. D.C. Rental
Hous. Comm'n, 682 A.2d 178, 185 (D.C. 1996) (noting that the more
recent version of Rental Housing Act conditions the award of
treble damages on a showing of bad faith), with Interstate, 501
A.2d at 1264-65 (holding that the Rental Housing Act of 1977
authorized treble damages without regard to willfulness or bad
faith on the part of the defendant landlord).  Stancil contends
that he did not act in bad faith because his financial
circumstances prevented him from making adequate repairs, citing
Killingham v. D.C. Rental Hous. Comm'n, 810 A.2d 925 (D.C. 2002).
In Killingham, the Court of Appeals affirmed a ruling that the
landlord had overcome a legal presumption of retaliation when
"the true basis of the problems [alleged to constitute
retaliation] was a serious negative cash flow.  Id. at 927.
Retaliation is not the issue here (although retaliation could be
a non-exclusive sign of bad faith).

provide those services was thus not a reduction in "previously provided related services" within the meaning of § 42-3509.01(a).[14]  However, there were minimally required services that Stancil did provide and then ceased to provide.  At least in the instance of providing hot water, as an obvious example, Stancil did provide the service (albeit not consistently at all hours) during the warm months.  Based on <u>Interstate</u>, 501 A.2d at 1262 ("The question of substantiality goes simply to the degree of the loss.") there can be no doubt that Stancil's failure to continue to provide hot water during the winter months amounts to a substantial reduction of previously provided services. Because, as explained in greater detail below, the precise amount of the rollback to be awarded to the Association is inconsequential, the court will bypass the issue of whether § 42-3509.01(a) applies to housing code violations continuously in existence since the commencement of the lease.

The issue of whether the continued failure to provide a service that was not in place at the commencement of a tenant's lease constitutes a reduction in "previously provided" services is difficult.  The statute can arguably be viewed as addressing a landlord who deprives the tenants of services their rent had

---

[14]  It is not possible to bypass this issue and resort to § 42-3502.08(a)(2) as the source of a rollback remedy.  Section 42-3502.08(a)(2) (permitting a rollback of the rent for excessive and prolonged violations of the housing regulations) contains a cap: rents may not be rolled back to "less than the September 1, 1983, base rent for the rental units."  The record does not permit the court to determine what that cap was.

previously covered and they had previously received.  When a
tenant enters into a lease which fails expressly to address a
service required by the housing regulations, the service is
nevertheless a "provided service" because it is a minimally
required service, and the rent paid is, by law, in exchange for
that service, with the tenant entitled to view the service as
being provided.  In other words, services required by the lease
(and the required minimal services any lease carries with it by
virtue of the housing regulations), qualify as "provided
services" at the time a lease is entered into.  The services
required at the commencement of the lease are deemed to be
"provided services" *at the commencement of the lease*, and a
failure to provide such services *after the commencement of the
lease* thus constitutes a reduction in previously provided
services.  For example, if a tenant leases an apartment in the
summer, heat in the winter is a "provided service" even though
the apartment is obviously not being heated in the summer.[15]

---

[15]  The statutory definition of "related services" is
ambiguous regarding whether those services required by law or by
the terms of the lease are deemed at the commencement of the
lease to be provided services.  D.C. Code § 42-3501.03(27)
provides:

> "Related services" means services provided by a
> housing provider, **required by law or by the terms of a
> rental agreement, to a tenant in connection with the
> use and occupancy of a rental unit**, including repairs,
> decorating and maintenance, the provision of light,
> heat, hot and cold water, air conditioning, telephone
> answering or elevator services, janitorial services or
> the removal of trash and refuse.

[Emphasis added.]

In Mudd v. D.C. Rental Hous. Comm'n, 546 A.2d 440 (D.C.
1988), decided after Afshar, the tenant was denied certain basic
services from the outset.  The Court of Appeals, in affirming an
award of treble damages, noted with seeming approval a conclusion
by the Rental Housing Commission that "a landlord's failure to
provide basic services and facilities, such as a working stove,
refrigerator, and heat, constituted a reduction of services under
D.C. Code § 45-1522 [(1977 Supp.)]" (a statute essentially the
same as D.C. Code § 42-3502.11 (2001) quoted above which permits
a reduction in the rent ceiling when there has been a reduction
in services provided).  Mudd, 546 A.2d at 443.  Although the
precise issue addressed by the Court of Appeals in Mudd was not
the correctness of the Commission's interpretation of the
statute, but rather the constitutionality of the statute as thus
interpreted and applied, the Court of Appeals likewise did not
express any concern that the statute was being improperly
interpreted.  The Commission's approach in Mudd would compel the
conclusion that "services previously provided" includes services
required by the housing regulations but not in place when the
lease commences.

The parties, however, have not addressed whether that
interpretation can survive in the face of D.C. Code § 42-
3502.08(a)(2) (2001), a specific provision authorizing rollbacks
of rent -- even if there has not been a substantial reduction in
services -- if there have been "excessive and prolonged
violations of the Housing Regulations . . . until such time as

75

the violations have been abated." See Afshar, 504 A.2d at 1109
(rent rollback, but not a rent-ceiling reduction or treble
damages, was warranted pursuant to § 42-3502.08(a)(2) based on
violations of the housing regulations even though there was no
finding of a substantial reduction in services).  Significantly,
§ 42-3502.08(a)(2) contains a cap: rents may not be rolled back
to "less than the September 1, 1983, base rent for the rental
units."[16]  The existence of § 42-3502.08(a)(2) rebuts the
argument that in order for the Rent Administrator's power to
address residential housing problems to be complete, the § 42-
3509.01(a) rollback remedy ought to be available when services
required by the housing code to be provided at the commencement
of the lease were never actually provided.[17]  Section 42-
3509.01(a) imposes no statutory cap on rollbacks that are
attributable to a substantial reduction of services arising from
excessive and prolonged violations of the housing code.  This
presents an issue of whether § 42-3502.08(a)(2) was intended to
be the exclusive rollback remedy for violations of the housing
code when the violations were already in place at the lease's
commencement, as any other interpretation would arguably render
the statutory cap in § 42-3502.08(a)(2) mere surplusage.  See

---

[16]  The record does not permit the court to determine what
that cap was, and accordingly the court cannot roll back rents
based on § 42-3502.08(a)(2).

[17]  It is odd, however, that § 42-3502.08(a)(2) places a
statutory cap on rollback damages whereas the Javins abatement
remedy authorizes a full abatement of rents when conditions so
warrant.

Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253, 1125 S. Ct. 1146, 117 L.Ed 391 (1992) (redundancies in ambiguous statutory provisions are to be avoided in interpreting the provisions unless there is no "positive repugnancy" in so interpreting the provisions); Varity Corp. v. Howe, 516 U.S. 489, 511, 116 S. Ct. 1065, 134 L.Ed 130 (1996) (interpreting the canon of statutory construction that "the specific governs the general" as "a warning against applying a general provision when doing so would undermine limitations created by a more specific provision").

When the housing code violation results from a substantial reduction of services that had actually been previously provided to the tenant, § 42-3509.01(a) plainly applies. However, if § 42-3509.01(a) were also held applicable to services not actually previously provided, it is hard to envision any instance in which excessive and prolonged housing code violations would not rise to the level of a substantial reduction in services. This counsels that § 42-3502.08(a)(2) should be viewed as the exclusive statute authorizing rollbacks of rent when there are excessive and prolonged housing code violations which do not arise from reduction of services actually previously provided: only if the two provisions were so interpreted would § 42-3502.08(a)(2), and its statutory cap on rollback damages, not be rendered mere surplusage.

That view finds some support in Afshar, 504 A.2d at 1109 (discussing predecessors to § 42-3502.08(a)(2)). In Afshar, the Rent Administrator did not find, as the tenants had requested, a

substantial reduction or elimination of services arising from
excessive and prolonged violations of the housing regulations
(Afshar, 504 A.2d at 1109), but that finding was apparently not
challenged on appeal.[18]  The rent ceiling can be adjusted for a
reduction in provided services.  See D.C. Code § 42-3502.11
(2001).  However, § 42-3502.08(a)(2) authorizes only a rollback
of the rent, not a reduction in the rent ceiling, for "excessive
and prolonged violations" of the housing regulations.  D.C. Code
§ 42-3502.08(a)(2) (2001); Afshar, 504 A.2d at 1109 n.7.  In
other words, a rent ceiling decrease is not available based on
only a showing of violations of housing regulations: those
violations may stay the implementation of a rent ceiling
increase, but, without a finding of a substantial reduction in
services, they do not affect the rent ceiling itself.  Afshar,
504 A.2d at 1109-1110 (discussing with approval a decision of the
old Rental Accommodations Commission).  The argument would then
be that if the services required by the housing regulations had
never actually been provided, violation of the housing
regulations by way of not providing the services does not equate

---

[18]  Had the tenants challenged that finding on appeal, it is
difficult to understand why prolonged and excessive violations of
the housing regulations would not be held to result in a
substantial reduction of services required to be provided under
the lease contract, leaving only the issue of whether the
services must have been previously actually provided.  The Court
of Appeals may have chosen not to address that point because it
concluded that even if the Rent Administrator had properly
lowered the rent ceilings based on the rollback of rents for
housing code violations, the rents charged by the landlord would
not have exceeded the rent ceilings.  Afshar, 504 A.2d at 1109.

78

to a reduction in previously provided services: if it did, the rent ceiling *would* be affected.

Given the conflicting arguments, and the absence of any need to resolve them, the court elects to bypass this issue.

5.    <u>Was any reduction of previously provided services done "knowingly" by Stancil?</u>  For § 42-3509.01(a) to apply based on a reduction of previously provided services, Stancil must have acted "knowingly."  In <u>Quality Mgmt., Inc. v. D.C. Rental Hous. Comm'n</u>, 505 A.2d 73 (D.C. 1986), the Court of Appeals construed a statute which, with differences of no relevance to the instant issue, was identical to § 42-3509.01(a).  The Court of Appeals upheld the Rental Housing Commission's following interpretation of "knowingly":

> [T]he term "knowingly" imports only a knowledge of the essential facts bringing petitioner's conduct within the reach of [the statute]; and, from such knowledge of the essential facts, the law presumes knowledge of the legal consequences arising from performance of the prohibited conduct.  In other words, . . . actual knowledge of the unlawfulness of the act or omission is not required.  This reading of the word "knowingly" might render immune from [the statute] those landlords whose violations result from excusable ignorance of some material fact, but not those who plead only that they did not understand the law.

<u>Quality Management</u>, 505 A.2d at 75.  Thus, Stancil acted knowingly even if he erroneously believed that the Tenants' good deal (through extremely cheap rent) ought to excuse his failure to provide previously provided services.

Services provided at Sherman Avenue during the claim period were substantially reduced or eliminated on one or more occasions

with respect to each of the Tenants.  Pursuant to complaints by
the Tenants, Stancil had notice of the reduction or elimination
of services previously provided at Sherman Avenue, at a minimum
in the case of hot water.  Stancil rendered the reduction or
elimination of services substantial by failing reasonably
promptly to restore the services.

6.  Is a rollback unavailable if the landlord's reduction of
services stemmed from his financial difficulties?  Stancil has
argued that he was unable promptly to provide services at the
expected level because of his financial difficulties.  That is
not a basis for declining to reduce rent based on the diminution
in services and facilities, nor is it a basis for holding Stancil
not liable for the excessive amounts paid.  In Majerle Mgmt.,
Inc. v. D.C. Rental Hous. Comm'n, 768 A.2d 1003, 1008 n.13 (D.C.
2001), vacated as to another part of the decision, 777 A.2d 785
(D.C. 2001), the District of Columbia Court of Appeals affirmed
an award based on a diminution in services and facilities, as
supported by various findings, including that "importantly, the
manager of the property, a witness called by Majerle,
acknowledged that the roof in the tenant's apartment had been
leaking since 1989, but that the property owner had been unable,
due to economic reasons, to repair it until 1995."  Economic
reasons are not a basis for escaping liability for a diminution
in services or facilities.

7.   <u>What Level of Rollback of Rents is the Association
Entitled to Recover?</u>  Stancil's breaches of the warranty of
habitability built into each tenant's lease were committed
knowingly and were severe, repeated, and of grossly unreasonable
durations.  At least in the case of hot water (for the reasons
discussed with respect to issue no. 4, above), they rise to the
level of a substantial reduction or elimination of related
services previously provided for the rental units within the
meaning of § 42-3509.01(a)(2).  The Association is thus entitled
to recover damages (in the form of a rollback of rents), and for
reasons discussed elsewhere, the precise amount need not be
quantified.

8.   <u>Is this Court Precluded by the Doctrine of Primary
Jurisdiciton From Adjudicating That a Rollback of Rents is
Appropriate?</u>  The parties have assumed that this court can decide
the Association's claim.  The rollback remedy, giving rise to the
Association's claim, is one that the DCRA is authorized to
administer, and the DCRA might have fixed rollback damages in a
different amount than this court has.  This raises the question
of whether the court ought to have referred the rollback issue by
way of abstention to the DCRA instead of addressing the rollback
issue itself (other than to allow or disallow the rollback claim
in accordance with the DCRA's decision).

In <u>Nathanson v. N.L.R.B.</u>, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed.
23 (1952), the Court addressed whether a court of bankruptcy
ought to abstain from adjudicating a claim for back pay (arising

from unfair labor practices) until the National Labor Relations
Board ("NLRB") has determined the appropriate amount of back pay
necessary to remedy the unfair practices.  The Court stated:

> The bankruptcy court normally supervises the
> liquidation of claims.  But the rule is not inexorable.
> A sound discretion may indicate that a particular
> controversy should be remitted to another tribunal for
> litigation.  And where the matter in controversy has
> been entrusted by Congress to an administrative agency,
> the bankruptcy court **normally** should stay its hand
> pending an administrative decision. . . .  It is the
> Board, not the referee in bankruptcy nor the court,
> that has been entrusted by Congress with authority to
> determine what measures will remedy the unfair labor
> practices.  We think wise administration therefore
> demands that the bankruptcy court accommodate itself to
> the administrative process and refer to the Board the
> liquidation of the claim, giving the Board a reasonable
> time for its administrative determination.

Id. at 30 (internal citations omitted and emphasis added). The
doctrine of primary jurisdiction "is a doctrine specifically
applicable to claims properly cognizable in court that contain
some issue within the special competence of an administrative
agency.  It requires the court to enable a 'referral' to the
agency, staying further proceedings so as to give the parties
reasonable opportunity to seek an administrative ruling." Reiter
v. Cooper, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604
(1993) (citing, inter alia, United States v. W. Pac. R.R. Co., 352
U.S. 59, 63-64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).  However,
"[n]o fixed formula exists for applying the doctrine of primary
jurisdiction.  In every case, the question is whether the reasons
for the existence of the doctrine are present and whether the
purposes it serves will be aided by its application in the

82

particular litigation." W. Pac. R.R. Co., 352 U.S. at 64.

The District of Columbia Court of Appeals has held the
doctrine of primary jurisdiction applicable to rent increase
issues that fall within the expertise of the DCRA.   Drayton v.
Poretsky Mgmt., Inc., 462 A.2d 1115, 1120 (D.C. 1983).   The
District of Columbia Court of Appeals has further held that the
doctrine of primary jurisdiction is not waivable.   See District
of Columbia v. Thompson, 570 A.2d 277, 288 (D.C. 1990), vacated
in part on other grounds, 593 A.2d 621 (D.C. 1991).[19]

Here, the doctrine did not preclude this court from hearing
the Association's claims and issuing a ruling.   Because the
Association is not actually collecting the rollback damages, and
is later held to not be entitled to treble damages, the exact
amount of damages is irrelevant.   Under § 42-3509.01(a), it is
obvious that some rollback damages are warranted, and that is all
the court need conclude.   That suffices to make the Association a

---

[19]   See also District of Columbia v. L.G. Indus., Inc., 758
A.2d 950, 956 (D.C. 2000) (forum selection of parties is not
dispositive).   But see D.C. Water & Sewer Auth. v. Delon Hampton
& Assocs., 851 A.2d 410, 416 (D.C. 2004) (issue of primary
jurisdiction could not be raised for first time on appeal);
Gibson v. Johnson, 492 A.2d 574, 575 n.1A (D.C. 1985) (court of
appeals declined to address the issue of primary jurisdiction in
the context of a rent ceilings issue because the parties failed
to raise the issue in the trial court or the appellate court).
In the federal courts, "primary jurisdiction" may be waived.
Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355,
367, 114 S.Ct. 855, 127 L.Ed.2d 183, 192 (1994); Baltimore & Ohio
Chicago Terminal R.R. Co. v. Wis. Cent. Ltd., 154 F.3d 404, 411
(7th Cir. 1998), cert. denied, 526 U.S. 1019, 119 S.Ct. 1254, 143
L.Ed.2d 351 (1999).   The court need not decide whether it must
follow Thompson as the claims here are ones of state law, or may
instead follow those federal decisions treating the primary
jurisdiction doctrine as waivable.

prevailing party presumptively entitled to attorney's fees.

Moreover, <u>Afshar</u> states that "a rollback serves to bring the rent into line with the services the landlord actually provides." 504 A.2d at 1108.  This remedy is no different than an abatement of rent for substantial housing code violations when tenants individually sue based on a breach of the warranty of habitability.  The doctrine of primary jurisdiction is inapplicable to determinations of whether housing code violations existed and the amount of a rent abatement by reason of any housing code violations.  <u>Drayton</u>, 462 A.2d at 1122; <u>Robinson v. Edwin B. Feldman Co.</u>, 514 A.2d 799 (D.C. 1986).  Only substantial housing code violations can serve as the basis for a <u>Javins</u> rent abatement,[20] and when the violations deprive the tenant of important services previously provided, the result is a substantial reduction in provided services within the meaning of § 42-3509.01(a), thus forming a basis for a rollback of rents. Because both the Tenants' claims for rent abatements and the Association's claim for a rollback of rents were presented to the bankruptcy court, it makes no sense for essentially the same issues regarding housing code violations to be tried twice, once before the bankruptcy court (pursuant to the Tenants' claims) and again before the DCRA (pursuant to the Association's claim)

---

[20]  <u>See</u> <u>Weintraub</u>, 458 A.2d at 47 n.5, citing <u>Javins</u>, 428 F.2d at 1082 n.63 ("The jury should be instructed that one or two minor violations standing alone which do not affect habitability are de minimis and would not entitle the tenant to a reduction in rent."); <u>Wright v. Hodges</u>, 681 A.2d 1102, 1105 (D.C. 1996).

unless in so doing the court would frustrate the objectives of the doctrine of primary jurisdiction: greater uniformity of result and the utilization of the specialized and expert knowledge of the agency.  <u>Thompson</u>, 570 A.2d at 287.

Those objectives would not be frustrated here.  It suffices to determine that as a matter of law some rollback of rents would be recoverable before the DCRA, whatever the magnitude.  There can be no question that Stancil's failure to provide hot water for substantial parts of the winters constituted a substantial reduction in previously provided services.  Were this record before the DCRA it would, as a matter of law, be clearly reversible error for the DCRA to not conclude that, at least with respect to Stancil's failure to provide hot water, the degree of the loss was substantial (the test posed by <u>Interstate</u>, 501 A.2d at 1262), and that this thus resulted in a substantial reduction of previously provided services.  Even if the DCRA interpreted the statute as parsimoniously as possible in favor of Stancil, because this case presents facts which, **as a matter of law**, must be held to constitute a substantial reduction in services, it is not a case requiring the DCRA's expertise and therefore the

doctrine of primary jurisdiction does not apply.[21]

This logically follows from the nature of the doctrine.  "A question of 'primary jurisdiction' [only] arises when a claim may be cognizable in a court but initial resolution of issues within the special competence of an administrative agency **is required**." Thompson, 570 A.2d at 288  (emphasis added).  Here the dispositive legal issue, the existence on this record of a substantial reduction in previously provided services based on the unavailability of hot water in the winter, required no special competence of the DCRA to resolve because, **as a matter of**

---

[21]  Because the statute is not susceptible of any interpretation other than that there was a substantial reduction in services, this is not an instance in which the doctrine of primary jurisdiction first requires the interpretation of the statute to be undertaken by the administrative agency.  See Vargo v. Barry, 667 A.2d 98, 102 n.6 (D.C. 1995); Estate of Underwood v. National Credit Union Admin., 665 A.2d 621, 633 (D.C. 1995) (concluding that because there was no "substantial question" whether the statute applied, the doctrine of primary jurisdiction did not require that the administrative agency charged with implementing the statute make the initial determination concerning coverage before the court could exercise jurisdiction).

**law**, the DCRA could only reach the same conclusion.[22]
Accordingly, the doctrine does not bar this court from concluding
that some rollback of rents would have been awarded had the claim
been pursued in the DCRA in the first instance.

Because there would be some rollback of rents in a
proceeding before the DCRA, that suffices to make the Association
a prevailing party presumptively entitled to recover attorney's
fees.[23]   That is the only other claim of the Association that
survives because, as next explained in part C, the claim for
trebling of damages must be disallowed.   Thus, the actual amount
of the allowed rollback of rents need not be fixed.

In these circumstances, it makes no sense to invoke the
doctrine of primary jurisdiction and to refuse to adjudicate that
the Association has a valid rollback claim.   The doctrine ought

---

[22]   See <u>Am. Cetacean Soc'y v. Baldridge</u>, 604 F.Supp. 1398,
1410 (D.D.C. 1985), <u>aff'd</u>, 768 F.2d 426 (D.C.Cir.1985), <u>rev'd on
other grounds sub nom.</u>, <u>Japan Whaling Ass'n v. Am. Cetacean
Soc'y</u>, 478 U.S. 221 (1986):

> This case is a simple issue of statutory
> interpretation.   Questions of law are particularly
> within the competence of the judiciary to resolve, and
> are not subject to initial agency consideration under
> the primary jurisdiction doctrine.   <u>Nader v. Alleghany
> Airlines</u>, 426 U.S. 290, 305-6, 96 S.Ct. 1978, 1987-88,
> 48 L.Ed.2d 643 (1976); <u>Great Northern Ry. Co. v.
> Merchant's Elevator Co.</u>, 259 U.S. 285, 290-91, 42 S.Ct.
> 477, 478-79, 66 L.Ed. 943 (1922).

<u>See also</u> <u>Wis. Cent. Ltd.</u>, 154 F.3d at 411.

[23]   As to the attorney's fees claim, that is an issue that
requires no particular expertise in rent law administration for
this court to address.   The doctrine of primary jurisdiction does
not apply to that claim.

not be applied in a mechanical fashion that is blind to the
purpose of the doctrine.[24]

C.

The record is devoid of evidence regarding the rent ceiling.
As the party pressing for treble damages, the Association had the
burden of production and the burden of persuasion on this issue.
That dual burden is not altered by the intervention of bankruptcy
as the setting in which the claim is litigated.  <u>Raleigh v. Ill.
Dep't of Revenue</u>, 530 U.S. 15, 120 S. Ct. 1951, 147 L.Ed.2d 13

---

[24]  As stated in <u>U.S. Pub. Interest Research Group v. Atl.
Salmon of Me., LLC</u>, 339 F.3d 23, 34 (1st Cir. 2003) (citations
omitted):

> In a nutshell, the primary jurisdiction doctrine
> permits and occasionally requires a court to stay its
> hand while allowing an agency to address issues within
> its ken.  Although sometimes treated as a mechanical
> and rigid requirement, the modern view is more
> flexible, and the decision usually depends on whether a
> reference will advance the sound disposition of the
> court case and whether failure to refer will impair the
> statutory scheme or undermine the agency to which the
> reference might be made.

As the court in <u>Thompson</u> noted, "[w]e **generally** defer to agencies
for initial resolution of issues the legislature has put in their
special competence."  570 A.2d at 287 (emphasis added).
Accordingly, the Court of Appeals does not view the doctrine in
an inflexible fashion.  <u>See</u> <u>Goode v. Antioch Univ.</u>, 544 A.2d 704,
706 n.5 (D.C. 1988) (noting that appropriate considerations
include that a litigant would suffer unwarranted substantial
delay by application of primary jurisdiction doctrine if the
agency can provide only limited assistance to a court that
otherwise has the power and the competence to resolve a dispute;
that the doctrine requires a case by case application; and that
the doctrine does not apply when specialized expertise does not
make the agency a preferable forum and judicial action will not
adversely affect the agency's performance of its
responsibilities).

(2000).  Both parts of the burden of proof -- the burden of
production and the burden of persuasion -- are substantive rights
that are not altered by the Bankruptcy Code.  See id, 530 U.S. at
20-21 & 21 n.1.  With respect to showing an entitlement to treble
damages under D.C. Code § § 42-3509.01(a) (including the issue of
rent ceilings), both burdens rested on the Association, and
District of Columbia law does not create a presumption that rent
ceilings were exceeded.

1.

Neither of the burdens of proof regarding the issue of rent
ceilings was discharged in this case by the Association's proof
of claim itself.  Under 11 U.S.C. § 502(a), a proof of claim is
deemed allowed unless objected to.  Once a claim is disputed, it
is no longer entitled to that effect.

2.

However, a properly executed and filed proof of claim
constitutes "prima facie evidence of the validity and amount of
the claim."  F.R. Bankr. P. 3001(f).[25]  When a claim is
undisputed, Rule 3001(f) plainly works no improper alteration of

---

[25]  In a chapter 11 case, a scheduled claim (unless
scheduled as disputed, contingent, or unliquidated) is accorded
the same effect.  F.R. Bankr. P. 3003(b)(1).

substantive rights as it is consistent with § 502(a).[26]

Rule 3001(f) similarly ought not be construed to create a presumption of validity, thereby altering substantive rights, when a claim is *disputed*. See Dick v. N.Y. Life Ins. Co., 359 U.S. 437, 446 (1959) (holding that "presumptions (and their effects) and burden of proof are 'substantive'" rather than procedural).[27]  Moreover, "a broad reading [of a Federal Rule] that would create significant disuniformity between state and federal courts should be avoided if the text permits." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 37-38, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).[28]

---

[26]   Section 502(a) and Rule 3001(f) permit a creditor initially to establish an *undisputed* claim by a proof of claim that avoids the expense that would be entailed if the creditor were required to proceed by way of a complaint and associated procedures for obtaining a judgment establishing the claim.  See In re Landbank Equity Corp., 973 F.2d 265, 269 (4th Cir. 1992). Clearly that function does not alter a substantive right (because the claim is undisputed).

[27]   The Federal Rules of Bankruptcy Procedure "shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2075.

[28]   The court need not fully explore when a duly promulgated Federal Rule is deemed to displace state law. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Hanna v. Plumer, 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); Byrd v. Blue Ridge Rural Electric Coop., Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); Walker v. Armco Steel Corp., 446 U.S. 740, 749-50, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980); Burlington Northern R.R. Co. v. Woods, 480 U.S. 1, 4-5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987).

For Rule 3001(f) to apply, the proof of claim must comply
with Rule 3001(a) which requires that a proof of claim shall
conform substantially to the appropriate Official Form.  In turn,
the Official Form requires a creditor to state on the proof of
claim the basis for the claim.  "In order for a claim to be
entitled to the weight afforded by Rule 3001(f), it must . . .
set forth the facts necessary to support the claim."  Collier on
Bankruptcy ¶ 3001.09[1] (15th ed. 2003) (footnote omitted).[29]  It
follows that when an adequate factual basis for a claim is not
stated, the proof of claim does not trigger Rule 3001(f) with
respect to the claim.[30]  Here, the proof of claim filed by the
Association failed to trigger Rule 3001(f) with respect to the
claim that treble damages were warranted.

---

[29]  See also In re Allegheny Int'l, Inc., 954 F.2d 167,
173-74 (3d Cir. 1992); Wright v. Holm (In re Holm), 931 F.2d 620,
623 (9th Cir.1991); In re Marino, 90 B.R. 25, 28 (Bankr. D. Conn.
1988).

[30]  See In re Hongisto, 293 B.R. 45, 50-51 (N.D. Cal. 2003)
(allegations in state court complaint appended to creditor's
proof of claim failed to state basis for imposing legal liability
on debtor for creditor's arrest: Rule 3001(f) was thus
inapplicable); Wilson v. Broadband Wireless Int'l Corp. (In re
Broadband Wireless Int'l Corp.), 295 B.R. 140, 145 (10th Cir. BAP
2003) (proof of claim which set forth facts not showing existence
of claim against debtor was not entitled to Rule 3001(f) effect);
In re Svendsen, 34 B.R. 341 (Bankr. D.R.I. 1983).  Whether the
proof of claim sets forth a sufficient factual basis to support
the claim is determined by the substantive nonbankruptcy law
governing the claim.  See In re Chain, 255 B.R. 278, 280-81
(Bankr. D.Conn. 2000) (proof of claim failed to establish that
guaranty was in writing and signed by the party to be charged as
required by Connecticut statute of frauds).

3.

Specifically, with respect to the claim for a recovery of rents based on a substantial reduction or elimination of services and facilities, the proof of claim failed to allege the necessary predicate to treble damages of rents charged or paid in excess of the applicable rent ceilings.  The Association's proof of claim asserted a claim of $296,711.82, and asserted as the basis for the claim "Lawsuit" and referred to an attached exhibit, the petition (including a First Supplement thereto) filed with the DCRA in <u>2922 Tenants' Ass'n v. Rufus and Delores Stancil</u>, TP No. 24993.  The petition itself failed to address whether the rents paid were in excess of rent ceilings, and thereby the petition (and the proof of claim incorporating the petition) failed to state a sufficient factual basis for awarding treble damages.

The petition never mentions rent ceilings.  The only mention of treble damages occurs in the part of the petition which alleges that services and/or facilities provided in connection with the units had been permanently or substantially reduced, and which asserts that the evidence would justify the awarding of triple damages, citing 14 D.C.M.R. § 4217.1.  However, § 4217.1 provides for an award of treble damages without mentioning the requirement of a showing that the rent charged or paid exceeded the rent ceiling, and in dispensing with that requirement is, as already noted, invalid under <u>Tenants of 738 Longfellow St.</u>, 575 A.2d at 1213.  In seeking treble damages, the petition failed to set forth that rents were paid in excess of the rent ceiling, a

necessary predicate for trebling damages.  The proof of claim,
which incorporated the petition, accordingly cannot be accorded
Rule 3001(f) treatment regarding the treble damage claim.[31]

4.

Stancil's objection contested his liability for treble
damages.  Because Rule 3001(f) did not apply to the issue of the
rent ceiling, the Association bore the burden of going forward
and producing evidence to demonstrate that the rents charged and
paid exceeded the rent ceilings.  Having presented no evidence
regarding the level of the rent ceilings, its claim for treble
damages must fail with respect to damages recoverable based on a
substantial reduction or elimination of services and facilities.

Although the court has ordered a substantial rollback of
rents, and a retroactive reduction of each Tenant's existing rent
ceiling might be justified, see Delwin Realty Co. v. D.C. Hous.
Comm'n, 458 A.2d 58 (D.C. 1983), the record does not even
establish the dollar level of the existing rent ceilings.  The
rents a landlord charges may, by reason of market forces or a
landlord's laxity in increasing rents, fall far short of the rent
ceilings applicable to his property.  Accordingly, the record
does not permit this court to find that the rents paid exceeded

---

[31]  The Association's defective proof of claim regarding
treble damages had an adverse practical effect on Stancil.  He
was not put on notice that the Association was claiming
violations of the rent ceilings as a basis for its claim, and,
accordingly, was not alerted to the significance of the level of
the rent ceilings in the determination of whether treble damages
could be recovered.

existing rent ceilings.

Even if the rent ceiling were retroactively reduced in a substantial percentage, or in the same amount as the court's rollback of rents, that might or might not result in the Tenant's payments of rents having exceeded the retroactively adjusted rent ceiling.  The rent ceiling depends in part on the base rent for the rental unit.  See D.C. Code § 42-3502.06(a).  The record is devoid of evidence of the base rents.[32]  Moreover, as Afshar demonstrates, what constitutes an act justifying a rollback of rents does not necessarily equate to an act justifying a reduction of the rent ceiling.  The court will not speculate what the DCRA would deem to be the appropriate reduction, if any, of the rent ceilings.

The Association never invoked the doctrine of primary jurisdiction under Drayton, 462 A.2d 1115, to request this court to stay this proceeding pending the outcome of the petition in the DCRA with respect to the claim for treble damages.  As in the case of the rollback remedy issue, Drayton does not require a different outcome even though the District of Columbia Court of Appeals has held that the doctrine of primary jurisdiction is not waivable.

The Association's petition in the DCRA for treble damages

---

[32]  D.C. Code § 42-3501.03(4) provides:

"Base rent" means that rent legally charged or chargeable on April 30, 1985, for the rental unit which shall be the sum of rent charged on September 1, 1983, and [certain authorized rent increases].

94

did not request a retroactive adjustment of rent ceilings, and
rested instead on 14 D.C.M.R. § 4217.1, a regulation which
improperly imposes treble damages without any requirement that
the rents charged or paid exceeded rent ceilings.  Because, as a
matter of law, the only petition pending before the DCRA sought
treble damages on an insufficient basis and the record here does
not, as a matter of law, support an award of treble damages, the
DCRA would similarly have been required to deny treble damages,
and a stay of these proceedings would have been pointless.  Cf.
Stevenson v. D.C. Bd. of Elections & Ethics, 683 A.2d 1371, 1378
(D.C. 1996).  For the same reasons discussed above as to why the
doctrine did not bar this court's ruling on the rollback remedy,
the doctrine of "primary jurisdiction" upon which Drayton is
founded ought not apply when the only issue to be stayed would be
a losing proposition for that party in the administrative agency
as a matter of law.

When, as here, the record (lacking any evidence of the rent
ceilings) would, **as a matter of law,** have compelled a denial of
treble damages by the DCRA, the doctrine of primary jurisdiction
does not apply as there is no need to resort to the expertise of
the administrative agency in deciding the treble damage claim.

The level of rent ceilings, as retroactively adjustable for
substantial reductions in services, would have been an issue
appropriate for resolution by the DCRA had that issue been
properly put into play here.  However, even in District of
Columbia courts, the doctrine of primary jurisdiction cannot

95

apply when an issue that would require resort to the expertise of
an administrative agency has not been pled as an issue requiring
resolution by the trial court.  Here, the level of rent ceilings
(whether as they existed or as they might be retroactively
adjusted) was not set forth as an element of the Association's
proof of claim asserting its claim for treble damages: the proof
of claim relied upon factual grounds devoid of any mention of
rent ceilings and on an invalid regulation (which does not
mention rent ceilings) as the legal basis for its treble damage
claim.

The proof of claim was the equivalent of a complaint, with
the objection to claim the equivalent of an answer.  See In re
Am. Exp. Group Int'l Services, Inc., 167 B.R. 311, 313 (Bankr.
D.D.C. 1994).  The Association never amended its proof of claim
to assert rent ceiling levels, and in particular rent ceiling
levels as they might be retroactively adjusted, as an element of
its claim.

The Association's pretrial statement filed May 24, 2004,
belatedly stated that "D.C. Code 2001 Ed. § 45[sic]-3509.01
allows treble damages," but stated that the treble damages
allowed by the statute are "for the amount that the rent
collected exceeds the allowable amount of rent."  The
Association's pretrial statement thus proceeded under an
interpretation of the statute that, like 14 D.C.M.R. § 4217.1,
conflicts with § 42-3509.01 by not limiting treble damages to the
"amount by which the rent exceeds the applicable rent ceiling."

96

Moreover, even if the pretrial statement could be read as referring to rent ceilings, it could be read as referring to only existing rent ceilings (as any adjustment of rent ceilings would properly be the province of the DCRA, not this court). Proof of those existing rent ceilings could have been presented.[33]  None was.

The pretrial statement did not state that the Association, incident to seeking treble damages, was seeking a retroactive adjustment of rent ceilings, the type of issue upon which resort to DCRA expertise would have been appropriate.  The Association's pretrial statement, in other words, did not suffice to place either the court or Stancil on notice that retroactive adjustments of rent ceilings were at issue, and thus did not alert Stancil or the court to the issue of primary jurisdiction that would have presented.

At trial, the Association presented no proof of even the level of existing rent ceilings.  Even if the Association had requested this court to adjust the rent ceilings retroactively, the existing rent ceilings are the starting point in making any

_____

[33]  Although the DCRA may have primary jurisdiction to act on petitions to adjust rent ceilings, D.C. Code § 42-3502.06 permits the existing rent ceiling to be ascertained as a matter of law upon a showing of the base rent (§ 42-3502.06(a)), annual adjustments of general applicability determined by the Rental Housing Commission (§ 42-3502.06(b)), and any increases or decreases to the rent ceiling that have been imposed by decisions (§ 42-3502.06(a)).

such reduction.[34]

The Association either failed to realize that rent ceilings were an element of its treble damage claim or deliberately relied upon a regulation and an interpretation of the statute which improperly dispense with a showing of rent ceilings. Either way, by pointing only to the invalid regulation and interpretation as the basis for recovering treble damages, and by failing to mention rent ceilings, the Association never put Stancil or the court on notice that rent ceilings were at issue. Stancil's right to a resolution of his objection to claim ought not be delayed further when the Association failed properly to put rent ceilings in issue. That Drayton and the doctrine of primary jurisdiction might have required staying a ruling on rent ceilings had retroactive adjustments of rent ceilings been put in issue is an irrelevant hypothetical.

D.

No additional damages (and hence, as well, no treble damages) are recoverable with respect to the other claims asserted in the Association's proof of claim.

---

[34] D.C. Code § 42-3502.11 provides in relevant part:

If the Rent Administrator determines that the related services or related facilities supplied by a housing provider for a housing accommodation or for any rental unit in the housing accommodation are substantially . . . decreased, the Rent Administrator may . . . **decrease the rent ceiling, as applicable, to reflect proportionally the value of the change in services or facilities.**

1.

One of those claims (set forth in the petition incorporated by the proof of claim) was for retaliatory actions directed against the Tenants in violation of what was previously D.C. Code § 45-2552 (1981) and is now D.C. Code § 42-3505.02 (2001). Such a claim provides a tenant with no independent cause of action for damages. Twyman v. Johnson, 655 A.2d 850 (D.C. 1995) (interpreting D.C. Code § 45-2552(a)). It is thus not a "claim" within the meaning of 11 U.S.C. § 101(5) for which payment may be sought by way of a proof of claim.

2.

The other claim (set forth in the petition incorporated by the proof of claim) was based on a rent increase taken while a unit was not in substantial compliance with the housing regulations and a failure to give 30-day notice of a rent increase.[35] Specifically, the petition alleged that in June 2000, the last month of the claim period at issue here, a $30.00 rent increase had been demanded of the tenant in apartment 201 (who is Armida Alfaro) as not having been preceded by 30-day notice or the filing of proper rent increase forms, and as having been taken while the unit was not in substantial compliance with the D.C. Housing Regulations.

---

[35] See D.C. Code § 42-3502.08 paragraphs (a)(1)(A) and (a)(2) (2001) (which address the effect of noncompliance with housing regulations on the permissibility of rent increases); D.C. Code § 42-3502.08(a)(1)(E) (2001) (which bars a rent increase unless 30-day notice is given under § 42-3509.04).

These claims would arguably support a claim under § 42-3509.01(a)(1) for demanding or receiving any rent for a rental unit in excess of the maximum allowable rent applicable to the unit under the provisions of D.C. Code §§ 42-3502.01 through 42-3502.21 (subchapter II of chapter 35 of title 42 of the D.C. Code (2001)). However, the petition did not claim that the $30 was *paid*, the Association's pretrial statement in this proceeding limited its claim to recovering a trebling of rent *paid* (and attorney's fees and costs), and Ms. Alfaro admitted that she stopped paying rent in April 2000, prior to the improper rent increase.

Even if relief had been sought regarding the $30 increase as having been improperly *demanded* albeit not paid, the court could direct an affirmative recovery of the $30 increase under § 42-3509.01(a)(1) only if it exceeded the applicable rent ceiling.[36] The Association, as discussed above with respect to the claim for treble damages based on a substantial reduction or elimination of services, failed to present evidence of the applicable rent

---

[36] In this regard, D.C. Code § 42-3502.07 (2001) does not list § 42-3502.08 as one of the provisions under which the rent ceiling may be adjusted. Instead, § 42-3502.08 is not a rent ceiling provision. See <u>Afshar</u>, 504 A.2d at 1109 nn. 7-8. Accordingly, even when there is a showing of the applicability of § 42-3502.08 paragraphs (a)(1)(A), (a)(2), and (a)(1)(E), that does not establish that rents were charged in excess of the rent ceiling, the necessary predicate for awarding damages under § 42-3509.01(a)(1) based on excessive rents having been charged.

ceilings, and thus may not recover damages on that basis.[37]

Because no damages can be awarded with respect to the $30 rent increase, it follows that treble damages are not recoverable as to this claim.  Moreover, the petition did not request a trebling of damages with respect to this claim.

E.

The petition filed in the DCRA lawsuit and incorporated as part of the Association's proof of claim includes a claim for reasonable attorney's fees.  D.C. Code § 42-3509.02 (2001) provides:

> The Rent Administrator, Rental Housing Commission, or a court of competent jurisdiction may award reasonable attorney's fees to the prevailing party in any action under this chapter, except actions for eviction authorized under § 42-3505.01.

The Association has limited its claim for attorney's fees to those incurred in the DCRA lawsuit, and does not seek attorney's fees incurred in the litigation of its claim in this court.  The proof of claim fails to state what portion of the Association's $296,711.82 claim is attributable to attorney's fees.

In its proposed findings of fact and conclusions of law, the Association asserts that because "[t]he Debtor presented no evidence to challenge the prima facie validity of the Association's claim for attorney's fees . . . . the Association's

---

[37]   Nor would an affirmative recovery be available based on the alternative remedy of a rollback of the *demanded* (but not paid) rent.  A rollback based on § 42-3509.01(a)(1) (which does not require a showing that the rent demanded exceeded the rent ceiling) would simply result in the $30 not being due (with no affirmative recovery because the $30 was never paid).

claim for attorney's fees should be allowed in the amount of
$38,133.50." The court, however, agrees with Stancil that the
proof of claim is not prima facie evidence under Rule 3001(f) of
the amount of the Association's attorney's fee claim. Nowhere in
its proof of claim did the Association ever assert that it was
entitled to attorney's fees in the amount of $38,133.50.
Although the Association's filings in connection with
adjudication of the debtor's objection to claim clearly indicate
that this is the amount sought, Rule 3001(f)'s evidentiary
presumption of prima facie validity only extends to the proof of
claim itself, not to allegations made in papers filed in
connection with the litigation of the objection to the claim.

Rule 3001(f) provides that "[a] proof of claim executed and
filed in accordance with these rules shall constitute prima facie
evidence of the validity and amount of the claim." Even though a
properly filed proof of claim is prima facie evidence of its
validity under Rule 3001(f), Raleigh teaches us that both the
burden of production and the burden of persuasion are substantive
rights that remain unaltered by the bankruptcy code. See
Raleigh, 530 U.S. at 20-21. Thus, rather than shifting those
burdens, Rule 3001(f) should instead be understood as providing
creditors with a potentially less cumbersome means by which to
satisfy those burdens.

In this case, the Association's proof of claim was entirely
silent as to the amount of attorney's fees sought in connection
with its claim. When a creditor asserts multiple bases for

102

recovery within a single proof of claim, as the Association has
done here, the creditor must somewhere in its proof of claim
specify how the value of the claim is to be divided among the
claim's various components.  If a creditor fails to provide such
a breakdown of values in its proof of claim, the specific amounts
the creditor wishes to claim as attributable to the different
components of its claim will need to be supported with additional
evidence if the claim is not allowed in its entirety.

Moreover, the issue of the appropriate amount of attorney's
fees was premature until the Association actually prevailed.[38]
Even if the amount of attorney's fees now claimed by the
Association had been set forth in the proof of claim and were
entitled to Rule 3001(f)'s evidentiary presumption of prima facie
validity, the issue is only now ripe to be litigated.  Stancil
was completely justified in his belief that the reasonableness of
any attorney's fees to which the Association might become
entitled was a question properly addressed only after the
Association prevailed on the merits of its underlying claim.
D.C. Code § 42-3509.02 makes clear that a party cannot seek a
recovery of attorney's fees under the statute unless and until
that party is found to be a "prevailing party" in an action
brought under Chapter 35 of the D.C. Code, and the Association

---

[38]  If the court treated the attorney's fee claim as not
having been premature, the Association would be the loser.  It
bears the burden of proving the amount of its attorney's fees
claim, but presented no evidence regarding the amount of
attorney's fees incurred: Rule 3001(f) did not supply such
evidence, and no other evidence was submitted.

did not become a prevailing party within the meaning of D.C. Code § 42-3509.02 until this opinion was issued.

The municipal regulation relating to recovery of attorney's fees that would have applied in the DCRA proceeding further supports this approach.  14 D.C.M.R. § 3825.2 provides that "a presumption of entitlement to an award of attorney's fees is created by a prevailing tenant, who is represented by an attorney."  14 D.C.M.R. § 3825.7, however, provides that "[a]n award of attorney's fees by the Rent Administrator or the Commission shall be based on an affidavit executed by the attorney of record itemizing the attorney's time for legal services and providing the applicable information listed in section 3825.8 [which lists factors to consider in a lodestar analysis]...."  Thus, under § 3825 it is only after a party prevails in the underlying litigation that a presumption of entitlement to attorney's fees arises, and the presumption that arises goes only to the question of "entitlement" to an undetermined amount of fees, not to the reasonableness of the amount of fees ultimately sought by the prevailing party.

For all of these reasons, and consistent with the procedure set forth in 14 D.C.M.R. § 3825.7, the procedure for addressing the reasonableness of attorney's fees claimed in connection with these proceedings will be for the Association, now that it qualifies as a "prevailing party," to submit a statement of fees for legal services to which the debtor may then object.

## VI

In closing argument Stancil's counsel argued that the
trustee, Webster, has a setoff claim against the tenants for rent
accrued during the administration of the case.  However, the
estate here has a surplus above all allowed claims, with the
result being that unliquidated claims the trustee had, if any,
will eventually be abandoned to Stancil.  There is no reason to
think that Stancil would succeed in collecting such claims:
Stancil's criminal sentence forbids his collecting rents until
the housing code violations have all been abated and Stancil
introduced no evidence to demonstrate the abatement of housing
code violations.  In any event, Stancil did not raise the issue
during the trial itself, and never sought an order to compel the
trustee to assert the claims or to abandon them to Stancil so
that they would properly be at issue in the trial.

## VII

An order follows.

[Signed and dated above.]

Copies to:

Edward M. Kimmel
[Counsel for Debtor]

Joshua R. Taylor
[Co-Counsel for the Association]

Charles A. Malloy
[Co-Counsel for the Association]

Adrienne DerVartanian
Julie L. Becker
Jennifer L. Berger
[Counsel for the Tenants]

Wendell W. Webster
[Chapter 7 Trustee]

Office of the United States Trustee